# REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-00509-D

| | | |
|---|---|---|
| SYNGENTA CROP PROTECTION, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ATTICUS, LLC,<br><br>Defendant. | ) | **AMENDED ANSWER AND COUNTERCLAIMS** |

Defendant Atticus, LLC ("Atticus"), hereby provides the following Answer and Counterclaims to Plaintiff Syngenta Crop Protection, LLC's ("Syngenta") Complaint for Patent Infringement [DE 1] ("Complaint"). To the extent not expressly admitted below, Atticus denies the specific allegations of the Complaint.

## NATURE OF THE ACTION

1. This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and such other relief as this Court deems just and proper. Briefly, as set forth below, Syngenta first developed and commercialized azoxystrobin, a breakthrough agricultural fungicide, as well as commercially viable methods of making azoxystrobin, which are protected by Syngenta's patents, including U.S. Patent Nos. 8,124,761 and 8,552,185 (collectively, "the Patents-in-Suit"). Atticus has infringed, and continues to infringe, Syngenta's patent rights by at least importing, using, selling, and offering to sell azoxystrobin products in the United States, including Atticus' ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL products, that are made using Syngenta's patented methods. Syngenta seeks damages adequate to compensate it for this infringement and a permanent injunction against Atticus to bar future infringement.

ANSWER: The first sentence of Paragraph 1 contains a legal conclusion to which no response is required. Atticus lacks sufficient information to admit or deny the allegations in the

second sentence of Paragraph 1, and, on that basis, Atticus denies those allegations. Attics denies all the remaining allegations of Paragraph 1 and denies that Syngenta is entitled to any damages or injunctive relief.

## PARTIES

2. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Syngenta is a world-leading agribusiness involved in the research, development, manufacture, and sale of fungicides, herbicides, insecticides, and other crop protection products.

ANSWER: This Paragraph consists of allegations that Atticus lacks sufficient information to admit or deny, and on that basis, Atticus denies the allegations of this Paragraph.

3. On information and belief, Atticus, LLC is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business at 5000 CentreGreen Way, Suite 100 Cary, NC 27513.

ANSWER: Admitted.

## JURISDICTION AND VENUE

4. This Court has exclusive subject matter jurisdiction over Syngenta's claims of patent infringement pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331, 1338(a), and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

ANSWER: This Paragraph contains a legal conclusion to which no response is required.

5. This Court has personal jurisdiction over Atticus, because Atticus is incorporated in the State of North Carolina, and Atticus further resides and maintains a principal place of business in the State of North Carolina. Atticus has also committed acts that infringe Syngenta's Patents-in-Suit in the State of North Carolina. Further, Atticus has systematic and continuous contacts with, regularly transacts business in, and regularly avails itself of the benefits of the State of North Carolina.

ANSWER: This Paragraph contains a legal conclusion to which no response is required. Atticus admits it is incorporated in the State of North Carolina and that it maintains a principal place of business in the State of North Carolina. Atticus admits it transacts business in the State of North Carolina. Atticus denies all the remaining allegations of Paragraph 5.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400 because Atticus resides in this judicial district, and further maintains a regular and established place of business in this judicial district, including at 5000 CentreGreen Way, Suite 100 Cary, NC 27513. Atticus also has committed acts of patent infringement in this judicial district.

ANSWER: This Paragraph contains a legal conclusion to which no response is required. Atticus admits it maintains a regular and established place of business in this judicial district, including at 5000 CentreGreen Way, Suite 100 Cary, NC 27513. Atticus denies all the remaining allegations of Paragraph 6.

7. Attached as Exhibit 1 to this Complaint are true and correct copies of pages from Atticus' website.[1]

ANSWER: Atticus admits that Exhibit 1 appears to be copies of pages from Atticus's website on November 8, 2019.

8. On its "Contact Us" webpage, Atticus directs its customers to Atticus' address at "5000 CentreGreen Way, Suite 100 Cary, NC 27513" and provides a North Carolina phone number. (Ex. 1 at 3.)

ANSWER: Admitted.

9. Through its website, and its facility located in Cary, North Carolina, Atticus offers to sell, and sells, a range of agricultural products, including end-use azoxystrobin products: ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL. (Ex. 1 at 4-8.)

[1] For ease of reference, page numbers have been added in the lower margin. Atticus' website is available at http://www.atticusllc.com (last accessed November 8, 2019).

ANSWER: Atticus admits that it offers to sell and sells ACADIA 2 SC, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL. Atticus denies the remaining allegations of Paragraph 9.

10. Atticus represents on its website that it has registered at least its ACADIA 2 SC, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL products in the State of North Carolina. (Ex. 1 at 9-10, 13, 15, 17.)

ANSWER: Admitted.

11. On information and belief, Atticus has also registered its ACADIA ESQ product in the State of North Carolina.

ANSWER: Admitted.

12. Attached hereto as Exhibits 2-6 are true and correct excerpted copies of Atticus' product labels for ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL, respectively. The product labels state that ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL are "Manufactured for: Atticus, LLC" and list the address of Atticus' facility in Cary, North Carolina: "5000 CentreGreen Way, Suite 100 Cary, NC 27513."

ANSWER: Atticus admits that Exhibits 2-6 are excerpted copies of Atticus's product labels for the products identified in Paragraph 12 and that, for each identified product, the excerpted label states "Manufactured for: Atticus, LLC" and lists the address of Atticus's facility in Cary, North Carolina as "5000 CentreGreen Way, Suite 100 Cary, NC 27513."

13. On information and belief, Atticus' employees at the facility in Cary, North Carolina direct or arrange for the manufacture of "azoxystrobin technical," a relatively pure form of azoxystrobin that is used as an active ingredient to formulate end-use azoxystrobin products.

ANSWER: Atticus admits that it purchases azoxystrobin technical from third parties for its azoxystrobin products. Atticus denies the remaining allegations of Paragraph 13.

14. On information and belief, Atticus' employees at the facility in Cary, North Carolina direct or arrange for the importation of azoxystrobin technical into the United States.

ANSWER: Atticus admits that it has imported azoxystrobin technical from third parties for its azoxystrobin products. Atticus denies the remaining allegations of Paragraph 14.

15. On information and belief, Atticus' employees at the facility in Cary, North Carolina direct or arrange for such imported azoxystrobin technical to be used to formulate Atticus' end-use azoxystrobin products, including ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL.

ANSWER: Admitted.

## BACKGROUND
## Syngenta's Patents-in-Suit

16. Beginning in the 1980s, Syngenta and its predecessors have spent significant resources researching and ultimately developing azoxystrobin, a break-through fungicidal chemical, which effectively controls fungal growth and enhances the yield of a variety of plants, including cereals such as wheat and barley as well as vines, fruits, vegetables, bananas, rice, soybeans, corn, turf, and ornamentals. Since the first commercially introducing azoxystrobin in 1997, Syngenta and its predecessors have manufactured, marketed, and sold end-use azoxystrobin products under a number of trade names, including ABOUND®, HERITAGE®, QUILT®, QUILT XCEL®, QUADRIS®, and HEADWAY® (among others). These products have been widely adopted and successful. Syngenta further supplies azoxystrobin technical to third-party manufacturers and distributors across the world.

ANSWER: The allegations of this Paragraph contain allegations about which Atticus lacks sufficient information to admit or deny, and on that basis, Atticus denies the allegations of this Paragraph.

17. In addition to developing and commercializing azoxystrobin, Syngenta has developed processes that make manufacturing azoxystrobin commercially viable. To protect its intellectual property in these processes, Syngenta has applied for and obtained patents, including, for example, U.S. Patent Nos. 8,124,761 and 8,552,185.

ANSWER: Atticus admits that the United States Patent Office ("USPTO") records list Syngenta as the current assignee of U.S. Patent Nos. 8,124,761("the '761 patent) and 8,552,185 ("the '185 patent"). The remaining allegations of this Paragraph contain allegations about which

Atticus lacks sufficient information to admit or deny, and on that basis, Atticus denies the remaining allegations of this Paragraph.

18. U.S. Patent No. 8,124,761 ("the '761 Patent"), entitled "Process for the Preparation of Azoxystrobin Using DABCO as a Catalyst and Novel Intermediates Used in the Process," was duly and legally issued by the U.S. Patent and Trademark Office ("USPTO") on February 28, 2012. A true and correct copy of the '761 Patent is attached to this Complaint as Exhibit 7. The '761 Patent is currently assigned to Syngenta Crop Protection, LLC.

ANSWER: Atticus admits that a copy of the '761 patent was attached to the Complaint as Exhibit 7. Atticus admits that the '761 patent bears an issuance date of February 28, 2012 and is titled "Process for the Preparation of Azoxystrobin Using DABCO as a Catalyst and Novel Intermediates Used in the Process." Atticus also admits that the USPTO assignment databases identifies Syngenta as the current assignee of the '761 patent. Atticus denies the remaining allegations of this Paragraph.

19. U.S. Patent No. 8,552,185 ("the '185 Patent"), entitled "Preparation of Azoxystrobin," was duly and legally issued by the USPTO on October 8, 2013. A true and correct copy of the '185 Patent is attached to this Complaint as Exhibit 8. The '185 Patent is currently assigned to Syngenta Crop Protection, LLC.

ANSWER: Atticus admits that the '185 patent was attached to the Complaint as Exhibit 8. Atticus admits that the '185 patent bears an issuance date of October 8, 2013 and a title of "Preparation of Azoxystrobin." Atticus also admits that the USPTO assignment database identifies Syngenta as the current assignee of the '185 patent. Atticus denies the remaining allegations of this Paragraph.

20. Both the '761 and '185 Patents are directed to the use of 1,4-diazabicyclo[2.2.2] octane ("DABCO") as a catalyst in the manufacture of azoxystrobin. The use of DABCO facilitates the commercial-scale manufacture of azoxystrobin by allowing the synthesis to take place faster and at lower temperatures, while reducing impurities and increasing product yield.

ANSWER: Atticus admits that the ’761 and ’185 patents disclose and claim, *inter alia*, the use of 1,4-diazabicyclo[2.2.2] octane (“DABCO”) only as a catalyst in the manufacture of azoxystrobin. Atticus denies the remaining allegations of this Paragraph.

21. Based on Syngenta’s experience, the benefits conferred by the use of DABCO as a catalyst are important for a manufacturer to stay competitive in the current market landscape, especially a generic manufacturer whose business model is to undercut its competition by selling at lower prices.

ANSWER: All the allegations of this Paragraph are “based on Syngenta’s experience.” Atticus lacks sufficient information to admit or deny the allegations “based on Syngenta’s experience,” and on that basis, Atticus denies the remaining allegations of this Paragraph.

## **Atticus’s [Alleged] Infringing Activities**

22. As of the filing of this Complaint, and over the previous two growing seasons dating back to 2017, Atticus has been the largest importer of azoxystrobin into the United States, outside of Syngenta and its partners and affiliates.

ANSWER: Denied.

23. During the 2017-2018 growing season, Atticus imported approximately 251,000 kilograms of azoxystrobin technical, representing approximately 44% of imports of azoxystrobin technical by generic manufacturers.

ANSWER: Atticus admits it imported azoxystrobin technical during the 2017-2018 growing season. The remaining allegations of this Paragraph are denied.

24. During the 2018-2019 growing season, Atticus imported approximately 266,000 kilograms of azoxystrobin technical, representing approximately 46% of all imports of azoxystrobin technical by generic manufacturers.

ANSWER: Atticus admits it imported azoxystrobin technical during the 2018-2019 growing season. The remaining allegations of this Paragraph are denied.

25. Upon importing this azoxystrobin technical into the United States, Atticus has used and continues to use it, or has caused and continues to cause it to be used, to formulate Atticus' end-use azoxystrobin products, including ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL.

ANSWER: Atticus admits that the azoxystrobin technical it has imported into the United States has, and is, being used to formulate certain azoxystrobin end-products.

26. Attached as Exhibit 9 is a true and correct copy of Atticus' product information sheet for ACADIA 2 SC.

ANSWER: Admitted.

27. As set forth [in] Atticus' product information sheet, product webpage, and product label, ACADIA 2 SC contains approximately 22.9% azoxystrobin as an active ingredient. (Ex. 1 at 9¬10; Ex. 2; Ex. 9 at 1.)

ANSWER: Admitted.

28. Attached as Exhibit 10 is a true and correct copy of Atticus' product information sheet for ACADIA ESQ.

ANSWER: Admitted.

29. As set forth Atticus' product information sheet, product webpage, and product label ACADIA ESQ contains approximately 18.2% azoxystrobin as an active ingredient. (Ex. 1 at 11-12; Ex. 3; Ex. 10 at 1.)

ANSWER: Admitted.

30. Attached as Exhibit 11 is a true and correct copy of Atticus' product information sheet for AQUILA XL.

ANSWER: Admitted.

31. As set forth Atticus' product information sheet product webpage, and product label AQUILA XL contains approximately 13.5% azoxystrobin as an active ingredient. (Ex. 1 at 13¬14; Ex. 4; Ex. 11 at 1.)

ANSWER: Admitted.

32. Attached as Exhibit 12 is a true and correct copy of Atticus' product information sheet for ARTAVIA 2 SC.

ANSWER: Admitted.

33. As set forth Atticus' product information sheet, product webpage, and product label, ARTAVIA 2 SC contains approximately 22.9% azoxystrobin as an active ingredient. (Ex. 1 at 15; Ex. 5; Ex. 12 at 1.)

ANSWER: Admitted.

34. Attached as Exhibit 13 is a true and correct copy of Atticus' product information sheet for ARTAVIA XCEL.

ANSWER: Admitted.

35. As set forth Atticus' product information sheet, product webpage, and product label ARTAVIA XCEL contains approximately 5.73% azoxystrobin as an active ingredient. (Ex. 1 at 17; Ex. 6; Ex. 13 at 1.)

ANSWER: Admitted.

36. As Atticus explains on its website, its products' "chemistry isn't unique." (Ex. 1 at 1.)

ANSWER: Atticus admits that its website states: "Atticus offers a broad and growing portfolio of branded-generic fungicides, herbicides and insecticides. While the chemistry isn't unique, the Atticus experience is. Delivering products that are relevant to your operation, and doing so at the right value, is how we ensure you win the crop protection battle." The remaining allegations of this Paragraph are denied.

37. The azoxystrobin technical that Atticus imports and/or uses to manufacture Atticus' end-use azoxystrobin products is made using the processes set forth in at least claim 1 of Syngenta's '761 Patent and at least claim 1 of Syngenta's '185 Patent.

ANSWER: Denied.

38. Atticus' azoxystrobin technical is made by reacting a compound of formula (II), as defined in the '761 and '185 Patents, with 2-cyanophenol. This reaction is sometimes referred to colloquially as the "condensation" reaction.

ANSWER: [redacted]

39. The condensation reaction used to manufacture Atticus' azoxystrobin technical is catalyzed using DABCO.

ANSWER: [redacted]

40. Among other things, the use of DABCO is confirmed by the presence of one or more impurities in Atticus' end-use products that are indicative of the use of DABCO to catalyze the condensation reaction by which Atticus' azoxystrobin technical is made.

ANSWER: [redacted]

41. On information and belief, Atticus's azoxystrobin technical is manufactured using DABCO at levels between 0.1 and 40 mol %, and more specifically between 0.1 and 2 mol %.

ANSWER: [redacted]

42. On information and belief, Atticus's azoxystrobin technical is manufactured by mixing DABCO in the presence of 2-cyanophenol

ANSWER: [redacted]

43. Atticus offers for sale, and sells, its end-use ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL products in this judicial district and elsewhere in the United States.

ANSWER: Atticus admits that it sells end-use products containing azoxystrobin under the above-identified brand names in this district and elsewhere in the United States.

44. On information and belief, Atticus also offers for sale, and sells, unformulated azoxystrobin technical in this judicial district and elsewhere in the United States.

ANSWER: Admitted.

45. Atticus' azoxystrobin products, including its azoxystrobin technical and end-use ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL products, compete directly against Syngenta's azoxystrobin products.

ANSWER: Atticus admits that azoxystrobin end-use products it sells compete with other generic companies that have EPA registrations and sell azoxystrobin products in the United States. Atticus denies the remaining allegations in this Paragraph.

46. Atticus markets its end-use ACADIA 2 SC, ACADIA ESQ, and AQUILA XL products as substitutes for Syngenta's azoxystrobin products.

ANSWER: Atticus admits that its azoxystrobin end-use products include the same active ingredient as Syngenta's products that contain azoxystrobin. Atticus denies the remaining allegations of this Paragraph.

47. Atticus represents to customers that ACADIA 2 SC is "[c]ompar[able] to" Syngenta's QUADRIS® and ABOUND® products and that it includes the same active ingredients as those products. (Ex. 1 at 4; Ex. 9 at 1.)

ANSWER: Atticus admits its website states its ACADIA2 SC product "compare[s] to" Quadris® and Abound®. Atticus admits its product brochure states that its ACADIA 2 SC product "[c]ontains azoxystrobin, the active ingredient used in Quadris® and Abound®."

48. Atticus represents to customers that ACADIA ESQ is "[c]ompar[able] to" Syngenta's QUADRIS TOP® and QUADRIS TOP® SB products and that it includes the same active ingredients as those products. (Ex. 1 at 4; Ex. 10 at 1.)

ANSWER: Atticus admits that its website as of November 8, 2019 stated that Atticus's ACADIA ESQ product "compare[s] to" Quadris Top® and Quadris Top® SB. Atticus admits that its product brochure on the website as of November 8, 2019 states that Atticus's ACADIA ESQ product "[c]ontains azoxystrobin, the active ingredient used in Quadris Top® and Quadris Top® SB."

49. Atticus represents to customers that AQUILA XL is "[c]ompar[able]" Syngenta's QUILT XCEL® product and that it includes the same active ingredients as that product. (Ex. 1 at 4; Ex. 11 at 1.)

ANSWER: Atticus admits that its website states that Atticus's AQUILA XL product "compare[s] to" Quilt Xcel®. Atticus admits that its product brochure states that Atticus's AQUILA XL product "[c]ontains azoxystrobin and propiconazole, the active ingredients used in Quilt Xcel®."

50. Atticus represents to customers that ARTAVIA 2 SC is "[c]ompar[able] to" Syngenta's HERITAGE® product and that it includes the same active ingredients as that product. (Ex. 1 at 4; Ex. 12 at 1.)

ANSWER: Atticus admits that its website states that Atticus's ARTAVIA 2 SC product "compare[s] to" Heritage®. Atticus admits that its product brochure states that Atticus's ARTAVIA 2 SC product "[c]ontains azoxystrobin, the active ingredient used in Heritage®."

51. Atticus represents to customers that ARTAVIA XCEL is "[c]ompar[able] to" Syngenta's HEADWAY® product and that it includes the same active ingredients as that product. (Ex. 1 at 4; Ex. 13 at 1.)

ANSWER: Atticus admits that its website states that Atticus's ARTAVIA XCEL product "compare[s] to" Headway®. Atticus admits that its product brochure states that Atticus's

ARTAVIA EXCEL product "[c]ontains azoxystrobin and propiconazole, the active ingredients used in Headway®."

52. Customers have purchased Atticus' azoxystrobin products, including ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL, instead of Syngenta's azoxystrobin products.

ANSWER: Atticus lacks information sufficient to admit or deny, and on that basis, therefore denies this allegation.

53. As a generic manufacturer, Atticus offers its azoxystrobin products, including ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL, at lower prices than Syngenta's azoxystrobin products.

ANSWER: Atticus lacks information sufficient to admit or deny, and on that basis, therefore denies this allegation.

54. Atticus' sales and offers for sale of azoxystrobin products have eroded, and continue to erode, the prices of Syngenta's azoxystrobin products.

ANSWER: Denied.

55. Syngenta's reputation is also harmed when customers choose Atticus' products, believing them to be comparable to Syngenta's azoxystrobin products.

ANSWER: Denied.

56. Atticus' activities have irreparably harmed, and continue to irreparably harm, Syngenta's business.

ANSWER: Denied.

57. On June 11, 2019, Syngenta sent a letter to Randy Canady, Founder and Chief Executive Officer of Atticus. A true and correct copy of that letter is attached as Exhibit 14.

ANSWER: Atticus admits that Syngenta sent a letter, dated June 11, 2019, addressed to Randy Canady, and that Exhibit 14 is a copy of that letter.

58. In its June 11, 2019 letter, Syngenta notified Atticus of the ’761 Patent and explained that “[i]f the azoxystrobin technical used to formulate [Atticus’] azoxystrobin end-use products was made by a process that uses the DABCO catalyst during the condensation reaction ‘in the presence of between 0.1 and 2 mol %,’ such conduct would constitute an infringement of one or more claims of the ’761 Patent.” (Ex. 14.)

ANSWER: Atticus admits that Syngenta sent a letter, dated June 11, 2019, addressed to Randy Canady, and that Exhibit 14 is a copy of that letter. The content of the letter in Exhibit 14 speaks for itself, and the remainder of the allegation in Paragraph 58 does not require any response from Atticus.

59. To the extent that Atticus contended that it was using a noninfringing process, Syngenta requested (among other things) that Atticus identify under a confidentiality agreement its supplier of azoxystrobin technical and the related manufacturing specifications and explain how its process does not infringe. (Ex. 14.)

ANSWER: Atticus admits that Syngenta sent a letter, dated June 11, 2019, addressed to Randy Canady, and that Exhibit 14 is a copy of that letter. The content of the letter in Exhibit 14 speaks for itself, and the remainder of the allegation in Paragraph 59 does not require any response from Atticus.

60. On June 21, 2019, Syngenta’s counsel emailed Atticus’ counsel, further notifying Atticus of the ’185 Patent and providing a confidentiality agreement by which the parties could exchange the information requested. A true and correct copy of the email is attached to this Complaint as Exhibit 15.

ANSWER: Atticus admits that Syngenta’s counsel sent an email to Atticus’s counsel and a copy of that email was included with the Complaint Exhibit 15. The content of the email in Exhibit 15 speaks for itself, and the remainder of the allegation in Paragraph 60 does not require any response from Atticus.

61. Since then, despite negotiations between the parties on the confidentiality agreement, Syngenta has been unable to obtain the information it requested from Atticus on reasonable terms.

ANSWER: Denied.

62. Atticus has been aware of Syngenta's '761 Patent since at least as early as June 11, 2019.

ANSWER: Admitted.

63. Atticus has been aware of Syngenta's '185 Patent since at least as early as June 21, 2019.

ANSWER: Admitted.

64. On information and belief, Atticus was aware of Syngenta's '761 and '185 Patents well before June 2019.

ANSWER: Atticus admits that it was aware of the '761 patent prior to June 2019. Atticus denies the remaining allegations of this Paragraph.

65. On March 27, 2015, Syngenta asserted the '761 Patent (among other patents) against certain generic manufacturers, including Willowood USA, LLC and related entities, in the U.S. District Court for the Middle District of North Carolina: *Syngenta Crop Protection, LLC v. Willowood USA, LLC et al.*, Case No. 1:15-cv-274 (Eagles, J.) ("Willowood Litigation").

ANSWER: Atticus admits that Syngenta asserted "at least claim 1" of the '761 patent against Willowood USA, LLC in the U.S. District Court for the Middle District of North Carolina. Atticus lacks sufficient information to admit or deny the remaining allegations of Paragraph 65, and on that basis, Atticus denies the remaining allegations of this Paragraph.

66. On September 13, 2017, a jury in the Willowood Litigation entered a verdict finding that the '761 Patent was valid and infringed.

ANSWER: Denied.

67. On September 18, 2017, Syngenta issued a press release providing notice that a jury in the Willowood Litigation had found the ’761 Patent valid and infringed. A true and correct copy of the press release is attached to this Complaint as Exhibit 16.

ANSWER: Atticus admits that Exhibit 16 appears to be a press release concerning the Willowood Litigation. Atticus lacks sufficient information to admit or deny the remaining allegations of Paragraph 67, and on that basis, Atticus denies any remaining allegations of this Paragraph.

68. The outcome of the Willowood Litigation was further publicized in industry publications. As an example, on September 18, 2017, AGDaily reported:

> A jury granted a major victory to Syngenta Crop Protection LLC and its customers Thursday after finding that Willowood infringed a patent relating to the manufacture of the fungicide azoxystrobin (U.S. Patent 8,124,761). The jury found that patent to be valid, and awarded Syngenta damages for Willowood’s infringement. The patent remains in effect until 2029 and has counterparts around the world.

A true and correct copy of the AGDaily article is attached to this Complaint as Exhibit 17.

ANSWER: Atticus admits that Exhibit 17 appears to be a copy of the above-noted press release (AGDAILY Reporters, *Syngenta wins patent infringement lawsuit against Willowood*, September 18, 2017, https://www.agdaily.com/news/syngenta-patent-infringement-willowood/. Atticus lacks sufficient information to admit or deny the remaining allegations of Paragraph 68, and on that basis, Atticus denies any remaining allegations of this Paragraph.

69. The district court in the Willowood litigation ultimately entered judgment and issued a permanent injunction against Willowood to bar infringement of the ’761 Patent.

ANSWER: Atticus lacks sufficient information to admit or deny, and on that basis, Atticus denies the allegations of this Paragraph.

70. Willowood did not appeal the judgment or the permanent injunction entered against it relating to the ’761 Patent.

ANSWER: Atticus lacks sufficient information to admit or deny, and on that basis, Atticus denies the allegations of this Paragraph.

71. When Syngenta appealed certain other rulings from the Willowood Litigation to the Federal Circuit Court of Appeals, Atticus and other generic manufacturers submitted an amicus brief in support of Willowood. A true and correct copy of the certificate of interest filed by Atticus and the other generic manufacturers is attached to this Complaint as Exhibit 18.

ANSWER: Atticus admits that it joined in an amicus brief submitted by other parties during the appeal of the Willowood Litigation pertaining to copyright issues. Atticus admits that Exhibit 18 purports to be a "certificate of interest" that lists Atticus, among other companies.

72. Atticus was, thus, aware of and following the Willowood Litigation.

ANSWER: Atticus admits it was aware of the Willowood Litigation. Atticus denies the remaining allegations of Paragraph 72.

73. On information and belief, Atticus was (1) aware of the existence [of the] '761 Patent; (2) aware that a jury in the Willowood Litigation had found the '761 Patent to be valid and infringed; (3) aware that the district court entered judgment and issued a permanent injunction against Willowood, another generic manufacturer, to bar infringement of the '761 Patent; and (4) aware that the judgment and permanent injunction entered against Willowood were not appealed.

ANSWER: Atticus admits it was aware of the existence of the '761 patent, and denies the remaining allegations of Paragraph 73.

**<u>COUNT I</u>**
**(Infringement of U.S. Patent No. 8,124,761)**

74. Syngenta incorporates by reference the allegations in Paragraphs 1 through 73.

ANSWER: Atticus repeats its answers with respect to the above-identified Paragraphs.

75. An actual and justiciable controversy exists between Syngenta and Atticus concerning Atticus' infringement of Syngenta's '761 Patent.

ANSWER: This Paragraph contains a conclusion to which no response is required.

76. Atticus infringes, and has infringed, at least claim 1 of the ’761 Patent under at least 35 U.S.C. § 271(g) by importing into the United States, and further using, offering to sell, and selling, azoxystrobin products, including azoxystrobin technical, ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL, that were made using Syngenta’s patented process.

ANSWER: Denied.

77. Syngenta has been damaged by Atticus’ infringement of the ’761 Patent in an amount to be determined at trial.

ANSWER: Denied.

78. Syngenta has suffered irreparable injury for which there is no adequate remedy at law, and will continue to suffer such irreparable injury, unless Atticus’ infringement of the ’761 Patent is enjoined by this Court.

ANSWER: Denied.

79. On information and belief, Atticus’ infringement of the ’761 Patent has been, and continues to be, willful.

ANSWER: Denied.

## COUNT II
## (Infringement of U.S. Patent No. 8,552,185)

80. Syngenta incorporates by reference the allegations in Paragraphs 1 through 79.

ANSWER: Atticus repeats its answers with respect to the above-identified Paragraphs.

81. An actual and justiciable controversy exists between Syngenta and Atticus concerning Atticus’ infringement of Syngenta’s ’185 Patent.

ANSWER: This Paragraph contains a legal conclusion to which no response is required.

82. Atticus infringes, and has infringed, at least claim 1 of the ’185 Patent under at least 35 U.S.C. § 271(g) by importing into the United States, and further using, offering to sell, and selling, azoxystrobin products, including azoxystrobin technical, ACADIA 2 SC, ACADIA ESQ, AQUILA XL, ARTAVIA 2 SC, and ARTAVIA XCEL, that were made using Syngenta’s patented process.

ANSWER: Denied.

83. Syngenta has been damaged by Atticus’ infringement of the ’185 Patent in an amount to be determined at trial.

ANSWER: Denied.

84. Syngenta has suffered irreparable injury for which there is no adequate remedy at law, and will continue to suffer such irreparable injury, unless Atticus’ infringement of the ’185 Patent is enjoined by this Court.

ANSWER: Denied.

85. On information and belief, Atticus’ infringement of the ’185 Patent has been, and continues to be, willful.

ANSWER: Denied.

## JURY DEMANDED

86. Pursuant to Federal Rule of Civil Procedure 38(b), Syngenta hereby respectfully requests a jury trial on all issues and claims so triable.

ANSWER: Atticus demands a jury trial “on all issues so triable.”

## PRAYER FOR RELIEF

WHEREFORE, Syngenta prays for the following judgments and relief against Atticus:

A. A judgment that Atticus has infringed the Patents-in-Suit;

B. A permanent injunction against Atticus and its affiliates, subsidiaries, assigns, employees, agents, or anyone acting in privity or concert with Atticus, from infringing the Patents- in-Suit;

C. An award of all damages adequate to compensate Syngenta for Atticus' patent infringement, such damages to be determined by a jury, and an accounting to adequately compensate Syngenta for the infringement;

D. An award of treble damages as a result of Atticus' willful infringement of the Patents-in-Suit;

E. An award of pre-judgment and post-judgment interest at the maximum rate allowed by law;

F. An award of Syngenta's costs as the prevailing party;

G. An order finding that this is an exceptional case and awarding Syngenta its reasonable attorneys' fees related to Atticus' patent infringement under 35 U.S.C. § 285 and all other applicable statutes, rules and common law; and

H. Such other further relief, in law or in equity, as this Court deems just.

ANSWER: Atticus denies that Syngenta is entitled to any relief requested in its "Prayer for Relief."

## AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in its responses to Paragraphs 1 through 85 of the Complaint, and without undertaking any of the burdens imposed by law on Syngenta, Atticus avers and asserts the following separate defenses to the Complaint. Atticus expressly reserves the right to allege additional defenses as they become known through the course of discovery or otherwise.

### FIRST DEFENSE
(Non-infringement of the ’761 Patent)

Atticus has not and does not infringe any valid and enforceable claim of the ’761 patent literally or under the doctrine of equivalents.

### SECOND DEFENSE
(Non-infringement of the ’185 Patent)

Atticus has not and does not infringe any valid and enforceable claim of the ’185 patent literally or under the doctrine of equivalents.

### THIRD DEFENSE
(Invalidity of the ’761 Patent)

The ’761 patent is invalid for failing to comply with at least one of the requirements for patentability set forth in the patent laws of the United States, 35 U.S.C. § 1, et seq., including without limitation, at least under 35 U.S.C. §§ 102, 103, and/or 112. Among other things, the ’761 patent is invalid as either anticipated or rendered obvious in view of US2003/0092723 alone, or in combination with WO 92/08703.

**FOURTH DEFENSE**
(Invalidity of the ’185 Patent)

The ’185 patent is invalid for failing to comply with at least one of the requirements for patentability set forth in the patent laws of the United States, 35 U.S.C. § 1, et seq., including without limitation, at least under 35 U.S.C. §§ 102, 103, and/or 112. Among other things, the ’185 patent is invalid as either anticipated or rendered obvious in view of US2003/0092723 alone, or in combination with WO 92/08703.

**FIFTH DEFENSE**
(Limitation on Damages)

Syngenta’s claim for damages and/or costs, if any, may be limited by 35 U.S.C. §§ 287 and/or 288.

**SIXTH DEFENSE**
(No Injunctive Relief)

Syngenta is not entitled to any injunctive relief because any injury is not irreparable. If liability was established, Syngenta would have an adequate remedy at law.

**SEVENTH DEFENSE**
(Failure to State a Claim)

The Complaint fails to state a claim on which relief can be granted.

**EIGHTH DEFENSE**
(Waiver, Acquiescence, Laches and/or Estoppel)

Syngenta’s claims, including the requests for damages and other relief, are barred in whole, or in part, by the doctrines of waiver, acquiescence, laches, and/or estoppel.

**NINTH DEFENSE**

(Patent Exhaustion)

Any valid and enforceable patent rights Syngenta had in any accused product have been exhausted through an authorized sale of the product embodying the patented invention.

## <u>COUNTERCLAIMS</u>

## PARTIES

1. Counterclaim Plaintiff Atticus, LLC ("Atticus") is a North Carolina limited liability company and has its principal place of business at 5000 CentreGreen Way, Suite 100 Cary, NC 27513.

2. According to Paragraph 2 of the Complaint, Syngenta Crop Protection, LLC ("Syngenta") is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012.

## JURISDICTION AND VENUE

3. These counterclaims arise under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, the Sherman Act and the Clayton Act, 15 U.S.C. § 1, *et seq.*, and the laws of the State of North Carolina

4. This Court has jurisdiction over the subject matter of these counterclaims under, without limitation, 28 U.S.C. §§ 1331, 1338, 2201, and 2202. This Court has supplemental jurisdiction over the subject matter of Atticus's counterclaims arising under state law pursuant to 28 U.S.C. § 1367.

5. Venue for these counterclaims is proper within this District under at least 28 U.S.C. §§ 1391 and 1400.

6. This Court has personal jurisdiction over Syngenta at least because Syngenta has submitted itself to the personal jurisdiction of this Court by commencing this action. Moreover, personal jurisdiction is appropriate over Syngenta because it maintains offices in this judicial district, and regularly conducts business in this district.

7. An actual controversy between Atticus and Syngenta exists because Syngenta is asserting infringement of the ’761 and ’185 patents and Atticus denies these assertions, and that controversy is of such immediacy and reality to warrant the issuance of a declaratory judgment.

8. As evidenced by Syngenta’s Complaint and Atticus’s Answer herein, there is an actual, substantial and continuing justiciable case or controversy between the parties regarding infringement and validity of the ’761 and ’185 patents.

**Overview of Syngenta’s Sham Litigation against Atticus**

9. On November 12, 2019, Syngenta instituted a patent infringement action against one of its major competitors, Atticus LLC, based on the testing of a single sample of only one of Atticus’s many azoxystrobin products. Based on that single test, Syngenta publicly accused every one of Atticus’s azoxystrobin products of infringing the ’761 and ’185 patents.

10. Based on its limited testing, Syngenta did not objectively know whether Atticus’s single product incorporated azoxystrobin that was made by an infringing process employing each and every limitation of any claim of the ’761 or ’185 patents. Accordingly, at the time Syngenta filed suit, Syngenta did not have an objectively reasonable basis to believe that the testing of the single Atticus sample established infringement of either the ’761 patent or the ’185 patent.

11. Additionally, based on information available to Syngenta, Syngenta knew or should have known that the single Atticus sample tested contained azoxystrobin over which Syngenta had no enforceable rights.

12. Further, Syngenta intentionally, recklessly, and wantonly avoided working with Atticus to learn about the source of the azoxystrobin in the single sample Syngenta tested. Had Syngenta conducted a sufficient pre-suit investigation—including working with Atticus with respect to the single sample tested by Syngenta—Syngenta would have confirmed that Syngenta's patent rights over the azoxystrobin in the tested sample were exhausted.

13. Rather than engage with Atticus—as Syngenta had done in the past with other companies—Syngenta filed its patent infringement suit against Atticus and issued a press release falsely accusing Atticus of patent infringement.

14. Under these circumstances, and given Syngenta's anticompetitive conduct in the azoxystrobin market, Syngenta's lawsuit against Atticus and conduct targeted at Atticus are objectively unreasonable and objectively baseless. Syngenta's present lawsuit against Atticus amounts to sham litigation intended to unfairly and anticompetitively decrease competition and harm consumer welfare in the azoxystrobin market.

**Atticus and Its Business of Offering Cost-Effective Pesticides**

15. Based in Cary, North Carolina, Atticus is an American-owned, privately held, and personally financed company that offers a broad and growing portfolio of branded-generic fungicides, herbicides, and insecticides. Atticus is uniquely positioned to focus on long-term decisions of its customers and is committed to supporting and bettering modern agriculture. Atticus focuses on off-patent crop protection—meaning products that are no longer protected by

U.S. patent—and employs a highly trained customer service team. Atticus conducts due diligence to ensure that the products it makes, uses, sells, or offers for sale do not infringe any party's valid intellectual property rights.

16. Atticus develops and sells a variety of off-patent products. One line of such an off-patent product Atticus has developed is its azoxystrobin-containing products. Atticus has been selling azoxystrobin products since 2017. [redacted]

17. [redacted]

18. The imported azoxystrobin technical is formulated and sold as different Atticus products, including Acadia 2 SC, Acadia ESQ, Aquila XL, Artavia 2 SC, and Artavia XCEL. Atticus also sells certain azoxystrobin products through private label agreements with customers.

19. [redacted]

**Azoxystrobin and Azoxystrobin-Containing Compounds**

20. Azoxystrobin is a popular fungicide known as a strobilurin and is effective against a broad spectrum of diseases on a wide variety of crops. The effectiveness and environmental profile of azoxystrobin has created strong demand for the product among growers.

21. Azoxystrobin was first discovered by Zeneca in the late 1980s. It was first marketed in the United States in 1996 using the brand name Amistar, and by 1999 it had been registered in 48 countries for use on more than 50 crops.

22. The compound azoxystrobin was disclosed and claimed in U.S. Patent Nos. 5,145,856, 5,468,747, 5,602,076, and 5,663,256. All of these patents expired by the end of 2014, if not earlier.

23. Because azoxystrobin is such an old compound, multiple methods of making the compound have been developed over the years. One method is described in International PCT Patent Application WO 92/08703, as discussed in one of Syngenta's asserted patents. Syngenta has additional patents claiming processes useful for making azoxystrobin and useful intermediates, including for example, U.S. Patent Nos. 5,847,138, 6,153,750, 6,162,916, 7,371,324, and 8,350,025.

24. Additional U.S. patents and applications that disclose methods related to making azoxystrobin include U.S. Patent Nos. 8,278,445, 9,556,128, 9,611,226, 9,929,015, 10,253,001 and U.S. Publication No. 2010/0179320. Foreign patent publications that disclose methods related to making azoxystrobin include WO 2008/043977, WO 2008/075341, WO 2014/190997, WO 2017/133283, WO 2019/178947 and CN 104311493A.

25. Also discussed in Syngenta's '761 patent is another prior art method for making azoxystrobin and related compounds, disclosed in International PCT Patent Application WO 01/72719 ("the '719 application"). The '719 application is of particular interest to the present dispute, as Atticus alleges, *inter alia*, that the Patents-in-Suit are invalid over the subject matter disclosed in the '719 application in combination with other prior art.

**Syngenta Background**

26. On information and belief, the first company called Syngenta was formed on or around November 2000 by the merger of Novartis Agribusiness and Zeneca Agrochemicals.

27. On information and belief, in February 2016, China National Chemical Group Ltd. ("ChemChina") China agreed to a $43 billion bid for Swiss seeds and pesticides group Syngenta. This bid was reported to be the largest ever foreign purchase by a Chinese-owned company. The deal required the approval of the Committee on Foreign Investment in the United States ("CFIUS") and European government panels, citing food safety and security concerns. The purchase was finalized in 2017.

28. On information and belief, Syngenta Crop Protection LLC is currently a wholly owned subsidiary of the Syngenta Group, which was formerly Syngenta Group Co., Ltd. As of June 2020, the Syngenta Group organization encompasses four business units: Syngenta Crop Protection; Syngenta Seeds; Adama; and Syngenta Group China.

29. On information and belief, the Syngenta Group also includes or has included Syngenta Limited, Syngenta AG, and Syngenta Supply AG (now known as Syngenta Crop Protection AG).

30. The Syngenta Group (including Syngenta) purports to be "a world-leading agribusiness involved in the research, development, manufacture, and sale of fungicides, herbicides, insecticides, and other crop protection products."

31. On information and belief, these Syngenta entities have worked in concert with respect to the development and sale of azoxystrobin throughout the world, and they continue to do so today, under the Syngenta Group umbrella, controlled in part by the Chinese government through ChemChina. ChemChina is a state-owned enterprise established by reorganizing companies affiliated to the former Ministry of the Chemical Industry, People's Republic of China. Less than a month ago, the United States Department of Defense released the names of additional "Communist Chinese military companies" operating directly or indirectly in the United States. ChemChina was included on the list of such companies.

32. As noted above, Adama is currently part of the Syngenta Group. On information and belief, Adama is a company that traces its history to two Israeli crop protection companies, Makhteshim and Agan, that were established in 1952 and 1945, respectively. Those two companies merged in 1997 to form Makhteshim Agan Industries, Ltd. ("Makhteshim Agan"). On information and belief, in 2011, Makhteshim Agan became part of ChemChina. On information and belief, in 2014, Makhteshim Agan became known as Adama. On information and belief, in January 2020, Adama became part of the Syngenta Group, created through the bringing together of the agricultural businesses of ChemChina. Thus, as of January 1, 2020, Adama and Syngenta are part of the same Chinese-owned conglomerate.

33. On information and belief, the Patents-in-Suit were originally owned by Syngenta Limited and licensed to Syngenta Crop Protection. The Patents-in-Suit were also previously licensed to Syngenta Supply AG (now Syngenta Crop Protection AG). Shortly before the present

action was filed, [redacted]

**Background on the EPA Registration Process of Agrichemicals**

34. The production, sale, and distribution of pesticides used in U.S. agriculture are regulated by the Environmental Protection Agency ("EPA"). The primary federal law governing pesticide use and sale in the United States is the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 61 Stat. 163, and currently codified at 7 U.S.C. § 136 *et seq.* The EPA is the primary federal agency tasked with interpreting and implementing FIFRA. The EPA has promulgated regulations for applying FIFRA and related laws governing the production, sale, and distribution of pesticides. *See* 40 C.F.R. Subchapter E. The EPA provides general information about the pesticide registration process in its *Pesticide Registration Manual*, which is published online at the EPA's website. https://www.epa.gov/pesticide-registration/pesticide-registration-manual.

35. Any entity that seeks to produce, sell, or distribute a pesticide must register with the EPA. A "company number" is a unique identifier assigned to a company that wishes to register a pesticide, *e.g.*, herbicide, rodenticide or antimicrobial with the EPA. A company that registers with the EPA to sell pesticides is referred to as a "registrant."

36. A company that "produces" pesticides is also required to obtain a Pesticide-Producing or Device-Producing Establishment Number ("EPA Establishment Number" or "EPA Est. No."). *See* https://www.epa.gov/pesticide-registration/pesticide-registration-manual-how-obtain-company-number-and-register-official.

37. The EPA Establishment Number indicates the final establishment at which a pesticide product was produced. *See* EPA, Office of Pesticide Programs, Label Manual Review at 14-3 (Mar. 2018) (citing 40 CFR 156.10(f); see also 40 CFR 167.3).

38. The EPA Registration Number indicates which company holds the registration for the pesticide product, and in which sequence the product was submitted to EPA by the company. EPA, Office of Pesticide Programs, Label Manual Review at 14-1 (Mar. 2018).

39. EPA Registration Numbers and EPA Establishment Numbers are publicly available and readily searchable on the EPA's website at https://www.epa.gov/compliance/national-list-active-epa-registered-foreign-and-domestic-pesticide-andor-device-producing. *See also* https://iaspub.epa.gov/apex/pesticides/f?p=PPLS:1

40. FIFRA and applicable regulations require that a company selling a pesticide in the United States must include EPA Registration Numbers and EPA Establishment Numbers on every product sold.

41. Every pesticide product sold in the United States has an EPA Establishment Number identifying where the end-use product was produced. Pesticide products sold in the United States typically include a unique batch or lot number to provide additional information on the particular details for that product. As such, the producer and registrant of the end-use product are publicly identifiable from the information contained on a product's packaging or labeling.

42. Under Section 3 of FIFRA, the EPA can register a pesticide for use throughout the United States. The registration of a pesticide is generally categorized into one of three categories: (a) new chemical or new active ingredient; (b) new use; or (c) identical/substantially similar product (formerly referred to as a "me-too" product).

43. Under FIFRA § 3(c)(1)(F)(i), a registrant is given a ten-year period of exclusive use for data submitted in support of a registration for a new pesticide chemical or registration for a new use of an already existing pesticide.

44. An "Identical/Substantially Similar" pesticide registration application refers to a request to register a new pesticide product that is: identical in its uses and formulation; or substantially similar in its uses and formulation to one or more products that are currently registered and marketed in the United States; or differs only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment.

45. There are multiple types of pesticide products that can be registered with EPA. Two common types of pesticide products are a manufacturing use product (also referred to as a "MUP") and an end-use product.

46. A MUP is any pesticide product other than an end-use product. A MUP may consist of the technical grade of active ingredient only, or may contain inert ingredients such as stabilizers or solvents. 40 CFR § 153(h).

47. One MUP for azoxystrobin is commonly referred to as "azoxystrobin technical," which typically is substantially pure azoxystrobin active ingredient—*i.e.*, the compound itself. Azoxystrobin technical is typically produced at greater than 95% purity (*e.g.*, "azoxystrobin 95%") and is manufactured as a solid form.

48. Another azoxystrobin MUP is a liquid formulation referred to as "azoxystrobin millbase." The azoxystrobin millbase is commonly formulated as a 50% by weight water-based solution, with other inert ingredients.

49. In contrast to a MUP, an end-use formulation is a product that is made for use by customers and includes the particular approved uses on its label. These products typically include the active ingredient in lower concentrations and additional inert ingredients approved by EPA. *See* EPA Pesticide Registration Manual, Ch. 10. End-use products are products that are formulated with EPA-approved MUPs in combination with EPA-accepted inert ingredients.

50. An end-use registration requires additional information including the source and identity of the active ingredient and all other inert ingredients. It also must identify the approved uses of the end-use product. An end-use registration includes information about the product label to be included with the end-use product when sold, and that labeling information will identify the approved uses for that product. The application for end-use registration identifies the EPA Registration Number for the source of the active ingredient and the EPA Establishment Number of any company that provides or manufactures the product.

51. FIFRA also authorizes the expedited registration of an identical/substantially similar product. In order to take advantage of the expedited review process, an applicant must establish that its product and labeling is substantially similar or identical to an already registered product. The applicant must also cite to the appropriate data for the existing product and agree to pay its fair share for use of that data. If those requirements are met EPA can approve the identical/substantially similar registration.

52. Additionally, the applicant for an identical/substantially similar pesticide must offer to pay appropriate compensation for reliance on necessary data that has already been submitted by prior registrants for the existing product, commonly referred to as "data compensation." *See* 40 C.F.R. § 152, Subpart E. Data compensation is required for registration of an identical or substantially identical new product, amendments to add a new use to an existing product

registration, and reregistration and registration review of an existing product. *See* 40 C.F.R. § 152.81(a). Data compensation requirements for a an identical/substantially similar application can be met by using the "cite all" method (40 C.F.R. § 152.86) or the "selective" method (40 C.F.R. § 152.90). Data compensation is an important part of FIFRA's scheme to allow for expedited approval of generic pesticides while compensating an earlier registrant for the value in the data that it developed to obtain the original registration.

53. A registrant can also file an abbreviated application for expedited approval of already-registered products using what is referred to as the "formulator's exemption." This exemption, pursuant to FIFRA § 3(c)(2)(D), excuses an applicant from the requirement to submit or cite data pertaining to any pesticide contained in a product that is derived solely from one or more EPA registered products which the applicant purchases from another registered entity.

54. FIFRA also allows for registration of a 100% repackaging of an identical already registered product. This is commonly referred to as a "repack." Repacks fall under the application requirements for identical/substantially similar products. As the EPA explains, "[a] complete (100-percent) repackaging of an identical, already registered product, where the same label is used for the product other than name, address, name of product, and registration number."

55. Generally, identical/substantially similar products are provided for by FIFRA to provide for increased competition among registrants and to incentivize a registrant to offer lower-cost alternative pesticides to the American public and the U.S. agriculture industry.

56. EPA regulations further detail the required contents and formatting of the label for any pesticide sold in the United States. 40 C.F.R. § 156.10. EPA has published a manual with extensive guidance on FIFRA's labeling requirements. *See* Office of Pesticide Programs, U.S.

Envtl. Prot. Agency, Label Review Manual (rev. 2016), https://www.epa.gov/sites/production/files/2017-09/documents/lrm-complete-aug-2017.pdf (Manual).

57. As the Label Review Manual explains, "[a] critical function of the label is to translate the results of the science evaluations into a set of conditions, directions, precautions, and restrictions that define who may use a pesticide, as well as where, how, how much, and how often it may be used." *Id.* at 1-2.

58. The label must identify the producer of the pesticide product. *See* 40 C.F.R. § 156.10(c) ("An unqualified name and address given on the label shall be considered as the name and address of the producer. If the registrant's name appears on the label and the registrant is not the producer, or if the name of the person for whom the pesticide was produced appears on the label, it must be qualified by appropriate wording such as "Packed for * * *," "Distributed by * * *," or "Sold by * * *" to show that the name is not that of the producer.").

59. FIFRA and applicable EPA regulations require that a company that sells or distributes a pesticide in the United States must include EPA Registration Numbers and EPA Establishment Numbers on every product sold on the label or the packaging of the product.

60. A pesticide product sold or distributed in the United States includes a unique batch (or lot) number to provide additional information on the particular details for that pesticide product. As such, the producer of the end-use product is publicly identifiable from the information contained on a products' packaging or labeling. The labeling or product packaging of an EPA-approved pesticide will thus identify the applicable EPA Registration Number(s), EPA Establishment Number(s), and product lot identification number(s).

61. [redacted]

**<u>Generic Pesticides Provide Lower-Priced Alternatives for American Agriculture</u>**

62. Generic pesticides provide numerous economic advantages to U.S. farmers and other entities in the U.S. agricultural economy. Generic pesticides are products that contain the same active ingredient or ingredients as a prior registrant. Generic pesticides are typically "off-patent," meaning the original patent protecting the chemical compound has expired. Generic pesticides help thousands of farmers who use them on hundreds of crops at substantial cost savings compared to the brand of the original manufacturer.

63. While generic pesticides are not necessarily "identical" to their branded equivalents, they tend to be very similar in terms of performance. In fact, to receive an EPA registration, a generic product must have the same active ingredient or ingredients in the same amount as the branded version. The form of the generic pesticide product must also be the same as the branded pesticide product. Often generic and branded pesticide products are even manufactured by the same companies, commonly referred to as "toll manufacturers."

64. Generic manufacturers are also held to the same EPA standards with regard to inert ingredients and additives. If the formula is changed by the generic manufacturer, the change must be approved by the EPA.

65. The average price for generic pesticides are typically lower for many reasons, including for example because they are manufactured by more companies rather than a single supplier and because of increased efficiencies in the manufacturing, distribution, and sales process.

66. While a generic pesticide is a more cost-effective equivalent to more expensive branded pesticides, not everyone at Syngenta is pleased with generic competition with its typically higher-priced branded products. [redacted]

**<u>Atticus's Development of Lower-Priced Azoxystrobin Products</u>**

67. Azoxystrobin is just one example of a pesticide that was originally a brand-only product but is now available in many EPA-approved identical/substantially similar products and formulations. Azoxystrobin was first approved by the EPA for marketing in the United States in 1996. Syngenta (or its relevant predecessor company) was the first company to obtain approval from the EPA to market azoxystrobin in the United States.

68. The expiration of Syngenta's patents protecting azoxystrobin as a compound and the expiration of Syngenta's ten years of regulatory exclusivity opened the door to EPA registration of identical or substantially similar azoxystrobin products. Many companies prior to

Atticus filed such applications with EPA and received registrations—both end-use and technical registrations—to sell azoxystrobin prior to Atticus.

69. [redacted]

70. [redacted]

71. [redacted]

72. Similar to those other companies, Atticus saw azoxystrobin as an opportunity to provide a lower-cost generic pesticide product in the United States. [redacted]

[redacted]

73. [redacted]

74. [redacted]

75. [redacted]

76. [redacted].

77. [redacted]

[redacted]

78. [redacted]

79. [redacted]

[redacted]

80. [redacted]

[redacted]

81. [redacted]

82. [redacted]

83. [redacted]

84. [redacted]

85. [redacted]

86. [redacted]

87. [redacted]

88. [redacted]

89. [redacted]

90. [redacted]

[redacted]

[redacted]

[redacted]

91. [redacted]

92. [redacted]

93. [redacted]

**Syngenta's Sale of Azoxystrobin Technical to Adama Was an Authorized Sale**

94. On information and belief, [redacted], Syngenta sold azoxystrobin technical and/or azoxystrobin millbase to Adama, through Adama Colombia, as part of one or more authorized sales; that azoxystrobin technical and/or azoxystrobin

millbase was then used by Adama Colombia to prepare the Strobe 2L end-use formulation that was later "repacked" by Control Solutions and sold to Atticus as the 5,400 pints of Artavia 2 SC product.

95. On information and belief, Syngenta sold azoxystrobin technical to Adama, through Adama Colombia, in the form of the 50% millbase MUP to make the 5,400 Artavia 2 SC pints. That included, *inter alia*, the azoxystrobin technical used to make Batch No. A27065.

96. On information and belief, any azoxystrobin technical Syngenta sold to Adama Colombia (which was then later sold to Control Solutions, as a MUP other end-use formulation), was made by Syngenta in accordance with the methods claimed in the Patents-in-Suit.

97. On information and belief, Adama Colombia formulated that azoxystrobin in Colombia into a 2 SC product for its affiliate Control Solutions, including Batch No. A27065.

98. On information and belief, Adama Colombia sold the formulated 2 SC product to Control Solutions as part of an authorized sale and arms-length transaction.

99. On information and belief, Control Solutions sold the formulated 2 SC product to Atticus.

100. Thus, on information and belief, the formulated end-use azoxystrobin product (*i.e.*, the 5,400 pints of azoxystrobin 2 SC) Atticus purchased from Control Solutions in 2018 was formulated with azoxystrobin technical that was made by Syngenta (or authorized to be made by Syngenta), and that azoxystrobin technical (or a product incorporating that azoxystrobin technical) was then subject to an authorized sale, thus exhausting any patent rights Syngenta might have in the azoxystrobin technical.

**Syngenta Has Taken Substantial Efforts to Maintain Control Over the Azoxystrobin Market**

101. Syngenta has undertaken significant and substantial efforts to obtain a controlling share of the azoxystrobin market. Syngenta has also undertaken significant and substantial efforts (and continues to undertake significant and substantial efforts) to maintain a controlling share of the U.S. azoxystrobin market, even after the expiration of its U.S. patents directed to the compound azoxystrobin, and even after the expiration of Syngenta's EPA regulatory exclusivity period.

102. [redacted]

103. [redacted]

104. [redacted].

105. [redacted]

106. [redacted]

[redacted]

107. [redacted]

108. [redacted]

109. [redacted]

[redacted]

110. [redacted].

111. [redacted]

[redacted]

112. [redacted]

113. [redacted]

114. [redacted]

115. [redacted]

116. [redacted]

117. [redacted]

118. [redacted]

119. [redacted]

120. [redacted] Thus, on information and belief, in order to access certain products (such as azoxystrobin) offered only by Syngenta, customers must also purchase products at a higher price from Syngenta that are readily available through alternative generic sources.

121. Syngenta provides numerous additional incentives, all designed to lock in customers at the earliest point in the growing season so that those customers are obligated to

purchase all their pesticide needs (include azoxystrobin) from Syngenta. [redacted]

122. [redacted]

123. [redacted]

124. All of these incentives are designed to maximize pressure on customers to purchase their needs for the growing season solely from Syngenta, and to do so as early as possible so as to prevent competitors from selling generic alternatives for certain of the necessary products (including azoxystrobin) to Syngenta customers (and ultimately to farmers) throughout the year. If a customer wants to buy one or two products (such as azoxystrobin) from a generic supplier, [redacted]

125. Syngenta has utilized these programs with the intent to maintain is monopolistic share of the U.S. azoxystrobin market [redacted] [redacted]. On information and belief, Syngenta continues to utilize these and similar programs with the intent to maintain is monopolistic share of the U.S. azoxystrobin market at as high as molecule share as it can, regardless of the anti-competitive effects of such programs.

126. [redacted], therefore further linking the purchase of products where there is significant generic competition to the purchase of higher priced Syngenta products where there is no practically available lower price generic alternative.

127. These [redacted] serve to maintain Syngenta's monopoly in the azoxystrobin market, which as Syngenta states it is "all about."

**<u>Syngenta's Efforts to</u>** [redacted]

128. Syngenta also works to [redacted], have the effect of maintaining Syngenta's market power in the azoxystrobin market, and maintain elevated prices and profit margins in a competitive market that it otherwise would not be able to do.

129. With respect to azoxystrobin, [redacted]

130. [redacted] On information and belief, Syngenta's plans to execute such a conversion is intended to gain or maintain market power and monopoly power in the U.S. azoxystrobin market.

131. Syngenta has further implemented a [redacted] that is intended to maintain or increase its market share of the azoxystrobin market. [redacted] Syngenta has intended to maintain its [redacted]

**Aggressive Pursuit of** [redacted]

132. [redacted] Syngenta also uses its [redacted] to minimize and hinder generic competition, thus keeping prices in the azoxystrobin market inflated. [redacted] On information and belief, [redacted] as a means to minimize competition in the U.S. azoxystrobin market.

**Syngenta Uses Its** [redacted] **to Exert Control Over the Azoxystrobin Market**

133. [redacted]

134. [redacted]

135. [redacted]

136. [redacted]

137. On information and belief, in 2009, Syngenta and Makhteshim Agan entered into a long-term agreement under which Syngenta agreed to supply Makhteshim Agan with azoxystrobin. http://news.agropages.com/News/NewsDetail---1935.ht

138. [redacted]

139. [redacted]

140. [redacted]

141. [redacted]

142. The sum effect of Syngenta's [redacted] is to enable Syngenta to maintain its market power in the U.S. azoxystrobin market and maintain higher prices for azoxystrobin products.

**Syngenta [redacted] in the Marketplace**

143. As a further aspect of its effort to exert its market power and monopoly power in the azoxystrobin market, Syngenta [redacted] also demonstrate that Syngenta is capable of conducting a pre-suit investigation to adequately determine whether an azoxystrobin product infringes any of Syngenta's patents.

144. [redacted]

145. [redacted]

146. [redacted]

147. [redacted]

148. [redacted]

149. [redacted] Syngenta has never filed a patent infringement action against [redacted] for its importation of azoxystrobin technical produced by [redacted]

150. [redacted]

151. On information and belief, Syngenta also investigated Control Solutions to determine whether its azoxystrobin products infringed Syngenta's patents. [redacted]

152. On information and belief, [redacted] Syngenta never filed a patent infringement action against Control Solutions.

153. On information and belief, Syngenta knows that Control Solutions imports and sells azoxystrobin products [redacted]

154. Syngenta's past actions toward Control Solutions demonstrates that Syngenta has acted reasonably against certain competitors when investigating potential infringement of Syngenta's patents. Syngenta's past conduct with Control Solutions also demonstrates that Syngenta is capable of conducting a pre-suit investigation to adequately determine whether an azoxystrobin product infringes any of Syngenta's patents.

**Syngenta Has a Pattern of Suing or Threatening to Sue Manufacturers or Importers of Azoxystrobin Without Conducting Reasonable Pre-Suit Investigation**

155. Syngenta also uses aggressive enforcement of intellectual property as one of its tools to suppress generic competition. [redacted]

156. In recent years, Syngenta asserts patent infringement against manufacturers of azoxystrobin before Syngenta conducts a sufficient assessment to determine whether the manufacturer is in fact infringing one of Syngenta's patents.

157. For instance, Syngenta has sued Helm (one of Atticus's suppliers of azoxystrobin technical) in Brazil, alleging that azoxystrobin technical that Helm purchased from Bhagiradha infringes one or more of Syngenta's Brazilian process patents (one of which claims a process that is similar to or the same as the process disclosed the '761 patent).

158. On information and belief, as part of the Brazilian lawsuit, Helm identified certain details concerning the chemical process used to manufacture the azoxystrobin purchased from Bhagiradha.

159. Syngenta knows that Helm supplied Atticus with azoxystrobin purchased from Bhagiradha. Moreover, at the time Syngenta filed suit against Atticus, Syngenta knows or should have known that Helm/Bhagiradha is not the source of the Artavia 2 SC product Syngenta tested in order to assert infringement of the Patents-in-Suit.

160. Syngenta never identified to Atticus the lawsuit filed against Helm in Brazil, before or after it filed the present action against Atticus.

161. In 2015, Syngenta also sued several Willowood entities. That case involved the expired compound patents, but Syngenta also asserted infringement of the ’761 patent. Syngenta asserted infringement of the ’761 patent despite having insufficient information about the manufacturing process to prove infringement of the ’761 patent. Syngenta ultimately did not prove infringement of the ’761 patent in that case by a preponderance of the evidence. Instead, the defendants failed to prove by a preponderance of the evidence that they did not infringe the ‘761 patent.

**<u>The Present Dispute Between Syngenta and Atticus</u>**

162. The present dispute between Syngenta and Atticus ostensibly started in June 2019, when Syngenta’s counsel wrote a letter identifying the ’761 patent as possibly relevant to Atticus's sales of azoxystrobin products.

163. The June 11, 2019 (“June 2019 letter”) letter, sent to Randy Canady (Founder and Chief Executive Officer of Atticus), sought to confirm that Atticus was not infringing the ’761 patent. The letter further explained that “[c]laim 1 of the ’761 Patent requires reacting compound (II) with 2-cyanophenol ‘in the presence of between 0.1 and 2 mol %’ of the catalyst DABCO.” *Id.* Syngenta’s letter referred obliquely to “other” Syngenta patents that might be relevant to Atticus’s azoxystrobin products but identified only the ’761 patent.

164. Atticus’s counsel promptly responded to Syngenta’s letter. Writing on June 21, 2019, Atticus’s counsel informed Syngenta’s counsel that “[w]e are in the process of reviewing the allegations and requests in your letter and will respond in due course.” Atticus’s counsel also

asked Syngenta's counsel to identify any other Syngenta patents that Syngenta's counsel "believe[d] are relevant to Atticus's making. using, offering to sell, selling, and/or importing azoxystrobin products."

165. Atticus's counsel also addressed the confidentiality concerns that Syngenta's counsel noted. Atticus's counsel wrote: "As you acknowledge, there may be significant confidentiality issues associated with any disclosure of information about the process of manufacture for Atticus's products. Please send us a draft confidentiality agreement for our consideration."

166. On June 26, 2019, Syngenta's counsel replied by email and also provided a draft confidentiality agreement. Identifying the '185 patent for the first time, Syngenta's counsel wrote: "In response to your request in your letter, U.S. Patent No. 8,552,185 also may be relevant." Syngenta's counsel gave no further explanation of if or how the '185 patent "may be relevant."

167. On July 10, 2019, Atticus's counsel replied by email and provided to Syngenta's counsel a revised confidentiality agreement and also offered to provide an executed copy of the agreement. Atticus's counsel explained: "As we noted in our initial response on June 21, once we have the Confidentiality Agreement in place, we can discuss further the substance of your June 11, 2019 letter."

168. On July 12, 2019, Syngenta's counsel rejected Atticus's draft and made additional proposed changes to the draft confidentiality agreement. The next week, Atticus's counsel responded and further explained that Syngenta's insistence of "allowing access of Confidential Information to a Syngenta employee is problematic and complicates the issues significantly." That

Syngenta employee was Dr. Alan Whitton, an inventor of the Patents-in-Suit, and a [redacted]

169. On August 2, 2019, Atticus's counsel followed up by email, explaining that, given the summer season, it was more difficult to obtain the necessary agreement and approvals. The next week, Atticus's counsel provided a revised and signed confidentiality agreement, executed by Atticus's CEO Mr. Canady.

170. Consistent with many protective orders (including the default patent protective order of the U.S. District Court of the Eastern District of North Carolina), the revised agreement would have enabled Syngenta's outside counsel (Kirkland & Ellis) to access and review, on an "outside counsel's eyes only" basis, the confidential chemical process for making azoxystrobin. Such a restriction is consistent with many standard protective orders that allow the designation of technical information as "Highly Confidential" (or "Outside Attorneys' Eyes Only") and prevents the disclosure of sensitive information to the receiving party's employees.

171. The full response of Atticus's counsel follows: "Thank you for your patience. We received input from the necessary parties and attach a revised confidentiality agreement. From our end, we have signed and executed this version. As you will see, we still object to individuals at Syngenta receiving confidential information. This is a strong objection from the third party we have to work with on this due to confidentiality obligations. And for purposes of sharing information, I am sure your team at Kirkland has the capacity to assess and review any information exchanged on an 'outside counsel eyes only' basis. The injunction language proposed is also relatively standard and particularly appropriate here given the nature of the potential exchange of information and the context of the discussions. If this is acceptable, please execute and send us a copy."

172. Under the confidentiality agreement signed by Atticus, Syngenta's outside counsel (but not Syngenta employees and scientists) would have had access to the confidential chemical process used to make the azoxystrobin Atticus imports and sells. Syngenta's counsel could have reviewed certain process information to conduct the necessary pre-suit investigation to assess whether Syngenta could reasonably allege infringement of the claims of the '761 and '185 patents.

173. After Atticus provided the signed confidentiality agreement, Atticus's counsel never heard back from Syngenta's counsel. On August 21, 2019, Atticus's counsel wrote to Syngenta's counsel: "We sent the signed confidentiality agreement two weeks ago, and we have not heard back from you yet. Please let us know when we can expect a response."

174. Syngenta never responded to the communication of Atticus's counsel dated August 21, 2019. Syngenta also did not acknowledge the signed confidentiality agreement that was sent on August 7, 2019. Rather than accept Atticus's offer to review certain information about the chemical process for making azoxystrobin technical under reasonable terms to maintain confidentiality, Syngenta sued Atticus on November 12, 2019.

175. Despite Syngenta's extensive efforts undertaken to track competitors' products and actively engaging competitors prior to bringing lawsuits, Syngenta opted here to test a single lot of a single Atticus product it knew or should have known came from a Syngenta-related entity, and file this lawsuit based on that information.

176. Syngenta unreasonably refused to review the information Atticus offered to provide under reasonable confidentiality terms, including sharing the information on an outside counsel only basis. Syngenta instead, on information and belief, obtained a single sample of one of Atticus's azoxystrobin products that Syngenta knew or should have known originated from a

Syngenta Group entity. Syngenta tested that single sample and based all of its infringement allegations on that single test.

177. Syngenta brought this action against Atticus without having a reasonable basis to allege that each and every Atticus azoxystrobin product infringed the ’761 and ’185 patents.

178. On information and belief, consistent with its scheme, Syngenta targeted Atticus to bring this lawsuit at a time that Syngenta thought would have the [redacted] Syngenta chose to employ the strategy of going the [redacted] not seeking to learn the relevant details of Atticus’s products before filing suit. [redacted]

**<u>Syngenta’s Presuit Testing Was Objectively Inadequate and Unreasonable For Syngenta to Allege Infringement of Atticus’s Products</u>**

179. Syngenta’s pre-suit investigation and testing of the single sample of Atticus’s azoxystrobin end-use product, *i.e.*, the Artavia 2 SC product (Batch No. A27065), were inadequate to demonstrate infringement of any claim of Syngenta’s Patents-in-Suit. Syngenta’s testing did not provide a reasonable basis to allege that the Artavia 2 SC product (Batch No. A27065) was made by a process that satisfied all of the limitations of the asserted claims.

180. In order to establish infringement of the ’761 patent, Syngenta must show that DABCO is used in very specific amounts. Claim 1 of the ‘761 patent requires that the claimed reaction occur in the presence of DABCO in an amount “between 0.1 and 2 mol %.”

181. This particular amount of DABCO is critical to any claim of infringement because the prior art ’719 application discloses making azoxystrobin using DABCO in amounts from 2 to 40 mol %. Without a showing that DABCO is used “between 0.1 and 2 mol %” in the claimed

reaction step, Syngenta cannot establish or reasonably allege infringement of claim 1 of the ’761 patent.

182. In order to establish infringement of the ’185 patent, Syngenta must show that DABCO is used in the claimed reaction step in a particular order with respect to the addition of the other reagents of the reaction. The process of the ’185 patent uses DABCO as the catalyst, but the claimed process specifies that DABCO is used in the range of “between 0.1 and 40 mol %.” That range is the same as the prior art range disclosed in the ’719 application.

183. Claim 1 of the ’185 patent further requires at least three limitations and a proviso about the ordering of the reaction steps and the amount of DABCO used. These limitations and proviso are set forth in the following “wherein” clause of claim 1 of the ’185 patent:

> wherein [DABCO] is not mixed with the compound of formula (II)or the compound of formula (III) unless 2-cyanophenol or the compound of formula (IV) is present; or (ii) [DABCO] is present as an acid salt or (iii) conditions are such that [DABCO] and the compound of formula (II) or the compound of formula (III) are not able to react with each other; with the proviso that when between 0.1 and 2 mol % [DABCO] is used, the [DABCO] is not added last.

184. Without a showing that the azoxystrobin technical Atticus imported was made using DABCO in the particular order of steps set forth in claim 1 of the ’185 patent, Syngenta cannot establish or reasonably allege infringement of claim 1 of the ’185 patent.

185. Syngenta provided, as part of its infringement contentions, the result of a single test of a single Atticus product. The product tested was identified as Artavia 2 SC. [redacted]

[redacted]

186. Syngenta did not disclose any of the details of its testing to Atticus until long after it filed the present action. Syngenta first provided the summary details of the testing on July 10, 2020, nearly one year after first alleging that Atticus's azoxystrobin products might infringe the Patents-in-Suit.

187. Despite testing a single product that it knows or should have known came from a Syngenta-controlled entity, Syngenta filed the present action alleging that each Atticus azoxystrobin product infringes the Patents-in-Suit.

188. Syngenta's testing methodology is insufficient to reasonably assert infringement. [redacted]

189. In the *Willowood* litigation, Syngenta presented, in the public record, sworn declaration testimony from Joseph M.D. Fortunak, Ph.D. *See* Declaration of Dr. Joseph M. D. Fortunak in Support of Syngenta's Motion for Partial Summary Judgment of Infringement, *Syngenta Crop Protection, LLC v. Willowood LLC*, No. 1:15-cv-00274-CCE-JEP (M.D.N.C. Oct. 31, 2016), Dkt. No. 96-1 (herein as "Fortunak Decl."). In the Fortunak Declaration, Syngenta's expert explained why he believed Willowood infringed the '761 patent. *See* Fortunak Decl. ¶¶ 120–43.

190. In doing so, Syngenta's expert Dr. Fortunak explained that the detailed testing he reviewed and discussed in his report [redacted] was insufficient to determine if the manufacturing process used DABCO in the amount required by the '716 patent. *Id.* Syngenta's expert made the following sworn statement: "In my opinion, however, the tests that have been conducted cannot by themselves establish the amount of DABCO that is used in the manufacturing process." Fortunak Decl. ¶ 135. Dr. Fortunak further stated in the same declaration: "The detected amounts do not reflect the amount of DABCO used in the manufacturing process, because the manufacturing process will remove the vast majority of the DABCO that was used."

191. Syngenta advanced similar arguments in its motion for partial summary judgment to the district court, citing the Fortunak Declaration. *See* Syngenta's Brief in Support of Its Motion for Partial Summary Judgment, *Syngenta Crop Protection, LLC v. Willowood LLC*, No. 1:15-cv-00274-CCE-JEP, at 27-29 (M.D.N.C. Oct. 31, 2016) (DE 95) (recognizing the need to rely on the § 295 presumption to show infringement). Dr. Fortunak testified similarly at trial in the Willowood case that there is no way to quantify, based on Syngenta's testing, how much DABCO was used.

192. Accordingly, even if Syngenta's testing is accurate, and even if DABCO were used in the manufacturing process for making the azoxystrobin technical at issue here, which it is not, Syngenta's testing does not provide any reasonable indication about the amount of DABCO used. Thus, at the time of filing suit against Atticus, Syngenta did not have a reasonable basis to allege that DABCO was used in the amounts required in claim 1 of the '761 patent.

193. For similar reasons, at the time of filing suit against Atticus, Syngenta did not have a reasonable basis to allege that DABCO was used in the amounts required in claim 1 of the '185 patent because Syngenta's testing methodology could not determine whether the azoxystrobin

technical used in the Artavia 2 SC product (Batch No. A27065) was made according to a process that used DABCO in the amounts required by the claims of the ’185 patent.

194. Further, Syngenta’s testing methodology does not provide any information about the ordering of the chemical reaction used to make azoxystrobin, including the order of addition of reactants, catalysts, and/or other reagents. As alleged above, Syngenta must establish that DABCO is used in the reaction and is not added unless (i) 2-cyanophenol is present; (ii) DABCO is present as an acid salt; or (iii) conditions are such that DABCO and a particular reagent are not able to react with each other. Claim 1 of the ’185 patent further specifies that, if DABCO is used in the range between 0.1 and 2 mol %, DABCO must not be added last.

195. While the scope of claim 1 of the ’185 patent is not clear and therefore indefinite, Syngenta’s testing provides no information about the order of steps. Thus, at the time of filing suit against Atticus, Syngenta did not have any reasonable basis to allege that each and every limitation of claim 1 of the ’185 patent was met, including the limitations relating to the ordering when DABCO was added to the reaction process.

196. Further, at the time Syngenta filed the present suit against Atticus, Syngenta knew or should have known multiple chemical methods are available to commercially manufacture azoxystrobin.

197. On information and belief, as of September 25, 2020, Syngenta has tested and/or analyzed only one Atticus-branded end-use product to determine whether any Atticus-branded azoxystrobin end-use products infringe the ’761 patent or the ’185 patent. For instance, Syngenta has contended that “Syngenta purchased an exemplarar [sic] of Atticus’[s] Artavia 2 SC end-use product and tested it [redacted]

198. On information and belief, as of both November 12, 2019 (when Syngenta filed its lawsuit against Atticus and issued its press release) and September 25, 2020, Syngenta had never tested any sample of Atticus's Acadia 2 SC, Acadia ESQ, Aquila XL, and Artavia XCEL to determine whether the product includes azoxystrobin technical made using a process claimed in the '761 or '185 patent.

199. On information and belief, as of both November 12, 2019 (when Syngenta filed its lawsuit against Atticus and issued its press release) and September 25, 2020, Syngenta has never tested any sample of Atticus's Acadia 2 SC product to determine whether the product includes azoxystrobin technical made using a process claimed in the '761 or '185 patent.

200. On information and belief, as of both November 12, 2019 (when Syngenta filed its lawsuit against Atticus and issued its press release) and September 25, 2020, Syngenta has never tested any sample of Atticus's Acadia ESQ product to determine whether the product includes azoxystrobin technical made using a process claimed in the '761 or '185 patent.

201. On information and belief, as of both November 12, 2019 (when Syngenta filed its lawsuit against Atticus and issued its press release) and September 25, 2020, Syngenta has never tested any sample of Atticus's Aquila XL product to determine whether the product includes azoxystrobin technical made using a process claimed in the '761 or '185 patent.

202. On information and belief, as of both November 12, 2019 (when Syngenta filed its lawsuit against Atticus and issued its press release) and September 25, 2020, Syngenta has never tested any sample of Atticus's Artavia 2 SC product, other than a single product from Batch No. A27605, to determine whether the product includes azoxystrobin technical made using a process claimed in the '761 or '185 patent.

203. On information and belief, as of both November 12, 2019 (when Syngenta filed its lawsuit against Atticus and issued its press release) and September 25, 2020, Syngenta has never tested any sample of Atticus's Artavia XCEL product to determine whether the product includes azoxystrobin technical made using a process claimed in the '761 or '185 patent.

204. Thus, it was objectively unreasonable for Syngenta to allege infringement of each of Atticus's azoxystrobin end-use products based on the single test Syngenta performed on Atticus's Artavia 2 SC product (Batch No. A27065).

**Syngenta Knew or Should Have Known that the Single Sample of the Atticus Artavia 2 SC Product It Tested Originated from a Syngenta Group Entity**

205. Syngenta knew or should have known that the Atticus Artavia 2 SC product (Batch No. A27065) tested by Syngenta was produced by a Syngenta Group entity. Syngenta knew or should have known that the Atticus Artavia 2 SC product (Batch No. A27065) it tested was made using azoxystrobin technical sourced from Syngenta or authorized to be made and sold by Syngenta.

206. Syngenta knew or should have known that the Atticus Artavia 2 SC product (Batch No. A27065) it tested was not representative of every azoxystrobin product Atticus sells or offers for sale.

207. [redacted]. In addition, each label also contained, *inter alia*, the Batch Number stamped on each bottle.

208. The Artavia 2 SC label for the Artavia 2 SC product (Batch No. A27065) purchased from Control Solutions includes, in pertinent part, the following identification information in terms of product source:

EPA Reg. No.: 92647-2-91234
EPA Est. No.: 53883-TX-002(A); 39578-TX-001(M); 67545-AZ-001(G)
First letter(s) in lot number correspond to letter(s) following the EPA Est. No.

Atticus

209. The label shows EPA Registration No. 92647-2-91234. Pursuant to EPA regulations, the first five digits 92647 corresponds to the company number for Tigris as the primary registrant. The last five digits 92135 corresponds to Atticus's company number as a sub-registrant. *See* 40 C.F.R. § 152.132(d)(3). Atticus is thus registered with EPA to distribute Artavia 2 SC under Tigris's EPA technical registration for this product.

210. For the Atticus Artavia 2 SC product (Batch No. A27065) tested by Syngenta, the label and the batch number stamped on the bottle identify that the product was produced by Control Solutions. The label provides three EPA Establishment Numbers: 53883-TX-002(A); 39578-TX-001(M); and 67545-AZ-001(G). The label also states: "First Letter(s) in lot number correspond to letter(s) following the EPA Est. No." Thus, the label explains that the first letter of the lot number (or batch number) (stamped on the pint bottle itself) identifies the EPA Establishment Number for the particular lot of the azoxystrobin product.

211. For the Atticus Artavia 2 SC product (Batch No. A27065) tested by Syngenta, the Lot Number was A27065, as stamped on the bottle. The "A" is the first letter of the lot, thus indicating which EPA Establishment Number applies to the batch tested by Syngenta. Thus, Lot A27065 identifies EPA Establishment Number 53883-TX-002(A).

212. On information and belief, Syngenta knows or should have known that the "53883" of the Establishment Number 53883-TX-002(A) corresponds to Control Solutions. For instance, based on searching the EPA's publicly available information, Syngenta knows or should have known that EPA Est. No. 53883-TX-002 corresponds to Control Solutions. Furthermore, Control Solutions is located in Texas, thus the "TX" in the Establishment Number.

213. On information and belief, Syngenta knows, or alternatively should have known, that the Atticus Artavia 2 SC product (Batch No. A27065) tested by Syngenta was produced by Control Solutions, which is, as an Adama subsidiary, a part of the Syngenta Group.

214. Syngenta never provided information about its single test of the Artavia 2 SC product to Atticus until September 25, 2020, nearly a year after filing the present action, when Syngenta served its infringement contentions. Even then, Syngenta designated the Batch Number and other information relating to its testing as "highly confidential," thus impeding Atticus's ability to investigate the source the azoxystrobin tested by Syngenta.

215. Furthermore, if Syngenta had cooperated with Atticus before Syngenta filed suit (as described above), Syngenta would have confirmed that the single Atticus product tested by Syngenta was produced by Control Solutions, which is, as an Adama subsidiary, a part of the Syngenta Group; and Syngenta would have confirmed that Control Solutions received the formulated azoxystrobin from Adama Colombia; and Syngenta would have confirmed that the

single Atticus product tested by Syngenta contained azoxystrobin technical made by Syngenta or authorized to be made by Syngenta. Thus, Syngenta would have confirmed that such azoxystrobin technical was subject to an authorized sale, and therefore Syngenta's patent rights (vis-à-vis the Patents-in-Suit) had been exhausted through an authorized sale.

216. To the extent Syngenta did not have actual knowledge of the source of the azoxystrobin technical used in the Atticus Artavia 2 SC product (Batch No. A27065), Syngenta unreasonably, wantonly, and recklessly avoided conducting the necessary pre-suit investigation and avoided confirming and/or learning such information by not agreeing to work with Atticus prior to filing suit in November 2019.

217. Beyond the information presented on the face of the product and the label, publicly available information based on government import records independently corroborate the likelihood that the Atticus Artavia 2 SC product (Batch No. A27065), produced by Control Solutions, contains azoxystrobin technical made by Syngenta or authorized to be made by Syngenta. The information from U.S. Customs and Border Protection records (available from third-party services that obtain and compile data based on the underlying U.S. Customs and Border Protection records) further confirm that the Atticus Artavia 2 SC product (Batch No. A27065) was prepared using an azoxystrobin formulation imported by Control Solutions from Adama Colombia.

218. Based on that data obtained from U.S. Customs and Border Protection, on information and belief, [redacted] imported the same type of azoxystrobin 2 SC product (a 22.9% by weight azoxystrobin suspension concentrate formulation) from Adama Colombia during the relevant timeframe. In February 2018, 1,019 kg of azoxystrobin formulated as Control Solutions Strobe 2L product arrived in the United States. In April 2018, approximately 944 kg of

azoxystrobin active ingredient formulated as Control Solutions Strobe 2L product arrived in the United States. *Id.* On information and belief, Strobe 2L is the same type of product as Artavia 2 SC that Atticus purchased in 2018 from Control Solutions. Both azoxystrobin products are suspension concentrate products with 22.9 wt% of azoxystrobin and are approved as substantially similar to Syngenta's Heritage® azoxystrobin 2 SC product. Both imports were shipped from Adama Colombia.

219. On information and belief, based on the publicly available information from the import records, during the relevant time frame (2017-2018), Control Solutions imported azoxystrobin products from Adama Colombia only. On information and belief, based on publicly available import records, during the relevant time frame (which is January-May 2018 when Atticus purchased the 5,400 pints, including the Atticus Artavia 2 SC product (Batch No. A27065)), Control Solutions did not import azoxystrobin products from any company other than Adama Colombia.

220. Lastly, based on publicly available reports, the U.S. Customs and Border Protection import records confirm that the azoxystrobin products imported by Control Solutions in February and April of 2018 were obtained from Adama Colombia. For instance, one publicly available report indicates arrival dates of January 17 and 30 and April 18, 2018, for imports from Adama Colombia to Control Solutions.

221. If Syngenta had conducted a sufficient pre-suit investigation or had cooperated with Atticus (as Syngenta had done with other companies in the past), including agreeing to receive information from Atticus under reasonable confidential conditions, it would have learned that the only product it tested was made from its own azoxystrobin product. Instead of conducting such due diligence, Syngenta intentionally avoiding engaging in pre-suit discussions with Atticus to

determine whether Syngenta had a reasonable basis to accuse all of Atticus's azoxystrobin products of infringing both the '761 and '185 patents.

**Syngenta's Lawsuit and Press Release Contain False Statements**

222. Syngenta's complaint accuses numerous products of patent infringement. Specifically, Syngenta asserted that Atticus's Acadia 2 SC, Acadia ESQ, Aquila XL, Artavia 2 SC and Artavia XCEL products each infringe the '761 and '185 patents relating to the manufacture of azoxystrobin fungicide.

223. On November 12, 2019—the same day it filed suit against Atticus—Syngenta issued a press release. The press release was widely reported in news outlets covering the agricultural industry. As of September 25, 2020, the press release remains on Syngenta's website at https://www.syngenta-us.com/newsroom/news_release_detail.aspx?id=212352.

224. The press release repeated Syngenta's accusation that "Atticus' Acadia 2 SC, Acadia ESQ, Aquila XL, Artavia 2 SC and Artavia Xcel products each infringe certain Syngenta patents relating to the manufacture of azoxystrobin fungicide." The preceding statement is false, and, at that time, Syngenta had no reasonable or factual basis to make that accusation.

225. Syngenta's press release also stated: "Atticus' infringement enables it to unfairly compete in the crop protection market and benefit from significant product development investments made by Syngenta, the original developer of azoxystrobin." The preceding statement is false, and, at that time, Syngenta had no reasonable or factual basis to make that accusation.

226. Syngenta's press release also conveyed the message that any azoxystrobin product Atticus sells infringes Syngenta's patents. That message is false.

**Syngenta's Actions Amount to Monopolization or An Attempt to Monopolize**

227. Syngenta has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the azoxystrobin U.S. market. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

228. For purposes of the Sherman Act count (and sham litigation allegation), the relevant product market is the U.S. market for azoxystrobin products.

229. Azoxystrobin offers unique advantages over other fungicides. That is, there are no substitutes for azoxystrobin. Atticus cannot avoid the sale of azoxystrobin technical or azoxystrobin end-use products in the azoxystrobin market. Atticus cannot avoid the sale of its Acadia 2 SC, Acadia ESQ, Aquila XL, Artavia 2 SC and Artavia XCEL products in the azoxystrobin market.

230. In short, Syngenta has eliminated or has attempted to eliminate competition in the azoxystrobin market through a carefully orchestrated campaign of post-patent expiration strategies, false statements to the public about Atticus's products, and sham litigation.

**Syngenta Possesses Market Power and Monopoly Power in the Relevant Market**

231. Syngenta has market power and monopoly power in the relevant market as a result of its now-expired patent protection for the compound azoxystrobin and its aggressive anti-competitive conduct that enables Syngenta to maintain a large majority of the azoxystrobin market.

232. As of 2015, Syngenta controlled [redacted] of the U.S. azoxystrobin market, as measured by the percentage of sales in the market for azoxystrobin-containing products. SYN_ATTICUS_00131270.

233. Based on publicly available import records, as of 2016, Syngenta was responsible for at least approximately 85% of the azoxystrobin imported into the United States. In 2018, Syngenta was responsible for at least approximately 70% of the azoxystrobin imported into the United States. In 2019, Syngenta was responsible for at least approximately 67% of the azoxystrobin imported into the United States. Thus, four years after Syngenta's patents covering the azoxystrobin compound expired, Syngenta still maintains a massive portion of the azoxystrobin market, despite the presence of numerous generic competitors importing azoxystrobin into the United States.

234. Because of its continued control on the market, Syngenta is able to charge supracompetitive prices for its azoxystrobin products. Syngenta implements [redacted] for its azoxystrobin products that includes a [redacted]

235. Both direct and indirect evidence demonstrate Syngenta's monopoly power. For instance, Syngenta has been able to extract large profits from the U.S. azoxystrobin market. In an internal presentation, Syngenta employees noted that Syngenta earned a gross margin from [redacted]

236. Further, Syngenta's activities, including activities related to their monopolization and attempted monopolization of the markets for azoxystrobin, are in the flow of, and substantially affect, interstate commerce.

**<u>Summary of Syngenta's Anticompetitive Conduct</u>**

237. In sum, Syngenta's continued monopoly power in the azoxystrobin U.S. market stems not from any innovation, growth, or development by Syngenta. Rather, it stems from

Syngenta's aggressive [redacted] aggressive threats of litigation; and engaging in sham litigation.

**<u>Syngenta Has Caused Injury to Atticus and to Competition</u>**

238. Syngenta's scheme to maintain and extend its monopoly in the azoxystrobin market has harmed Atticus in its business and property by creating a monopoly in the azoxystrobin market, and by attempting to exclude Atticus from participating in the azoxystrobin market through its sham litigation. Syngenta has instituted the present sham litigation as an effort to impose financial and reputational harm on Atticus and to restrict the access to the azoxystrobin market and the reduce consumer harm and choice.

239. Atticus's injury is the kind of injury that the antitrust laws are intended to prevent. Syngenta's monopoly power would not exist but for Syngenta's patent rights, but the legitimate use of its patent rights do not include the use of its patents as part of a sham litigation. As a defendant subject to Syngenta's sham litigation, Atticus has suffered financial and reputational harm.

240. Syngenta's monopoly power and sham litigation harms competition and reduces innovation and consumer welfare. Syngenta's process patent portfolio consists of patents that are invalid, not infringed, and individually weak, such that they should not have been asserted against Atticus. There is a strong "patent-related policy of eliminating unwarranted patent grants so the public will not 'continually be required to pay tribute to would-be monopolists without need or justification.'" *Actavis*, 133 S. Ct. at 2233 (quoting *Lear, Inc. v. Adkins*, 395 U.S. 653, 670 (1969)).

241. Syngenta can impose disproportionate litigation costs on defendants operating in the azoxystrobin market. Given the size of Syngenta and the vast resources available to it,

Syngenta is able to exert pressure and associated costs on Atticus through its litigation tactics in a manner that enables Syngenta to carry out its anticompetitive scheme, thus injuring Atticus and reducing competition in the marketplace.

242. Syngenta has also caused anticompetitive injury by attempting to remove Atticus's lower-priced competitive alternative azoxystrobin products from the market. Syngenta's attempt to remove Atticus's azoxystrobin products from the azoxystrobin market is part of Syngenta's concerted effort to maintain artificially high prices for its own azoxystrobin products and for which Syngenta seeks to extract those supracompetative charges from the American farmer.

**Syngenta's Patent Suit Is A Sham Litigation and Objectively Baseless**

243. Syngenta's patent case is "a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor." *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965).

244. Syngenta's case is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and "the litigant's subjective motivation" must be "to interfere directly with the business relationships of a competitor." *Capitol One; Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014).

245. Syngenta's litigation was objectively baseless "at the time it was filed." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 148 (3d Cir. 2017) (citing *PRE*, 508 U.S. at 60 n.5). Based on the information Syngenta had available to it, Syngenta had no objectively reasonable basis to allege that all or any of Atticus's azoxystrobin products infringed either the '761 or the '185 patents.

246. Syngenta's lawsuit is objectively baseless because, at the time of filing the suit, Syngenta did not have a reasonable basis to establish infringement for the alleged unauthorized importation of azoxystrobin technical into the United States for Atticus's azoxystrobin products.

247. [redacted]

248. [redacted]

249. [redacted]

250. [redacted]

251. To the extent that the sole tested product that Syngenta based its infringement case on could reasonably be asserted to infringe, that product was a product that utilized Syngenta's own azoxystrobin technical product that was an authorized sale to Adama [redacted]

252. The authorized sale of the azoxystrobin product to Adama exhausted Syngenta's patent rights as a matter of law with respect to Control Solutions and Atticus, and as such Syngenta cannot reasonably assert that even that single product infringes the claims of the Patents-in-Suit.

**<u>Syngenta’s Conduct Has No Procompetitive Justification</u>**

253. Syngenta’s conduct with respect to azoxystrobin sales and its litigation against Atticus produces no innovation or output gains. Instead, Syngenta's conduct seeks to artificially maintain higher than competitive pricing in the azoxystrobin market. The only meaningful effects of Syngenta’s conduct are to create otherwise-absent monopoly power, generate supracompetitive profits for Syngenta at the expense of retailers, consumers, and competitors, suppress consumer welfare, harm dynamic and allocative efficiency, and cause significant deadweight loss to society.

254. Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Atticus to treble the amount of its actual damages attributable to Syngenta’s unlawful monopolization in an amount to be determined at trial, plus the cost of suit, including reasonable attorney’s fees.

255. Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Atticus to an injunction preventing and restraining Syngenta’s conduct in violation of Section 2 of the Sherman Act, and to an award of the cost of suit, including reasonable attorneys’ fees.

## <u>COUNT ONE</u>
## (DECLARATION OF NON-INFRINGEMENT OF THE ’761 PATENT)

256. Atticus incorporates and realleges the allegations of Paragraphs 1-255 of these counterclaims.

257. The azoxystrobin technical that Atticus imports and/or uses to manufacture Atticus’ end-use azoxystrobin products is not made using the processes set forth in any claim of Syngenta’s ’761 Patent.

258. Atticus is entitled to and respectfully requests a declaratory judgment that Atticus does not infringe and has not infringed, any valid and enforceable claim of the ’761 patent either literally or under the doctrine of equivalents.

## COUNT TWO
## (DECLARATION OF NON-INFRINGEMENT OF THE ’185 PATENT)

259. Atticus incorporates and realleges the allegations of Paragraphs 1-258 of these counterclaims.

260. The azoxystrobin technical that Atticus imports and/or uses to manufacture Atticus’ end-use azoxystrobin products is not made using the processes set forth in any claim of Syngenta’s ’185 Patent.

261. Atticus is entitled to and respectfully requests a declaratory judgment that Atticus does not infringe and has not infringed, any valid and enforceable claim of the ’185 patent either literally or under the doctrine of equivalents.

## COUNT THREE
## (DECLARATION OF INVALIDITY OF THE ’761 PATENT)

262. Atticus incorporates and realleges the allegations of Paragraphs 1-261 of these counterclaims.

263. The claims of the ’761 patent are invalid for failure to comply with one or more of the statutory provisions of 35 U.S.C. §§ 101, *et seq.*, including without limitation §§ 102, 103, and/or 112.

264. More specifically and without limitation, the ’761 patent is invalid as either anticipated pursuant to 35 U.S.C. § 102 or as obvious pursuant to 35 U.S.C. § 103 based upon prior art, including, but not limited to, US2003/0092723 alone, or in combination with WO 92/08703.

265. Atticus is entitled to and respectfully requests a declaratory judgment that the claims of the ’761 patent are invalid.

**COUNT FOUR**
**(DECLARATION OF INVALIDITY OF THE ’185 PATENT)**

266. Atticus incorporates and realleges the allegations of Paragraphs 1-265 of these counterclaims.

267. The claims of the ’185 patent are invalid for failure to comply with one or more of the statutory provisions of 35 U.S.C. §§ 101, *et seq.*, including without limitation §§ 102, 103, and/or 112.

268. More specifically and without limitation, the ’185 patent is invalid as either anticipated pursuant to 35 U.S.C. § 102 or as obvious pursuant to 35 U.S.C. § 103 based upon prior art, including, but not limited to, US2003/0092723 alone, or in combination with WO 92/08703.

269. Atticus is entitled to and respectfully requests a declaratory judgment that the claims of the ’761 patent are invalid.

## COUNT FIVE
## (MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT)

270. Atticus incorporates and realleges the allegations of Paragraphs 1-269 of these counterclaims.

271. Syngenta has engaged in the anticompetitive and exclusionary practices previously alleged with the specific purpose and intent of obtaining monopoly power in the market for selling azoxystrobin pesticide products in the United States.

272. Syngenta has either already acquired or presents a dangerous probability of achieving monopoly power in this relevant market.

273. Syngenta has thereby attempted to monopolize this relevant market, in violation of Section 2 of the Sherman Act.

274. As a direct result of Syngenta's attempted monopolization, Atticus has been injured in its business and property, as previously alleged. Atticus's injuries directly result from Syngenta's unlawful conduct and are injuries of the type the antitrust laws were intended to prevent and which flow from that which makes Syngenta's conduct unlawful.

275. Syngenta has further injured competition in the market for azoxystrobin in the United States as a direct result of Syngenta's attempted monopolization through anticompetitive tactics, including but not limited to, Syngenta's use of [redacted]

276. Section 4 of the Clayton Act, 15 U.S.C. § 15, entitles Atticus to treble the amount of its actual damages attributable to Syngenta's unlawful monopolization and sham litigation in an amount to be determined at trial, plus the cost of suit, including reasonable attorney's fees.

277. Section 16 of the Clayton Act, 15 U.S.C. § 26, entitles Atticus to an injunction preventing and restraining Syngenta's conduct in violation of Section 2 of the Sherman Act, and to an award of the cost of suit, including reasonable attorney's fees.

**<u>COUNT SIX</u>**
**(DEFAMATION)**

278. Atticus incorporates and realleges the allegations of Paragraphs 1-277 of these counterclaims.

279. Syngenta has published false statements about Atticus and its azoxystrobin products to persons and entities other than Atticus.

280. Those statements include, but are not limited to, the false statements made in the press release published on the day Syngenta filed its Complaint against Atticus.

281. Those statements were made with wanton disregard for the actual truth, namely whether "each" of Atticus's azoxystrobin products infringed Syngenta's asserted patents.

282. Syngenta had no factual basis to make such a public statement, but did so anyway with the intention to harm Atticus's reputation in the agricultural industry.

283. Syngenta's false statements are defamatory *per se* in that (a) they tend to impeach Atticus in its business; (b) they charge that the sale or use of Atticus's azoxystrobin products are illegal because they infringe Syngenta's patents, and (c) they subject Atticus to scorn, ridicule and disgrace in the U.S. agricultural market by stating that its azoxystrobin products infringe Syngenta's patents.

284. As a direct and proximate result of Syngenta's defamatory statements, Atticus has been injured through direct diversion of sales, lessening of goodwill associated with Atticus's

azoxystrobin product and its other products, and damage to its reputation and business standing in the U.S. agricultural industry.

285. Syngenta's defamatory statements have been willful, wanton, and in reckless disregard of Atticus's rights and interests. Atticus therefore should be awarded punitive damages in an amount to punish Syngenta for such misconduct and to deter such misconduct in the future.

## COUNT SEVEN
## (VIOLATIONS OF N.C. GEN. STAT. § 75-1.1, *et seq.*)

286. Atticus incorporates and realleges the allegations of Paragraphs 1-285 of these counterclaims.

287. As alleged above, Syngenta has engaged in unfair or deceptive acts in or affecting commerce, including in North Carolina, thereby causing actual damage to Atticus in violation of N.C. Gen. Stat. § 75-1.1.

288. The harm caused by Syngenta, which has its United States headquarters in North Carolina, has harmed Atticus in North Carolina, which also has its headquarters in North Carolina.

289. As a direct and proximate result thereof, Atticus has been damaged in its business or property in an amount to be proved at trial, which amount should be trebled pursuant to N.C. Gen. Stat. § 75-16.

290. As a direct and proximate result thereof, Atticus has sustained irreparable injury to its business, reputation and good will and will continue to do so unless and until Syngenta's unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*, are enjoined.

291. Syngenta's activities alleged herein that constitute unfair and deceptive acts or trade practices in violation of N.C. Gen. Stat. § 75-1.1, *et. seq.* were willful. Atticus is therefore entitled,

pursuant to N.C. Gen. Stat. § 75-16.1, to recover its reasonable attorneys' fees incurred in connection with this action.

## COUNT EIGHT
## (ATTORNEYS' FEES)

292. Atticus incorporates and realleges the allegations of Paragraphs 1-291 of these Counterclaims.

293. Syngenta's allegations of infringement were made without information as to the process used to make the azoxystrobin imported by Atticus. Had Syngenta reasonably negotiated to obtain access to that information under an appropriate confidentiality agreement, it would have determined that its assertions of infringement in its Complaint were and are unreasonable, and unfounded.

294. Moreover, Syngenta's case was based on the test of a single product that it new or should have known was made using Syngenta sourced azoxystrobin. Nevertheless, Syngenta asserted that every Atticus azoxystrobin product infringed the claims of the '761 and '185 patents

295. Syngenta's actions in bringing this case against Atticus stand out from other patent cases given the weakness of its infringement case, its failure to reasonably assess Atticus's products prior to filing suit, and its continued litigation based on a single test of a single batch of a single product that cannot as a matter of fact and law—even if accurate—provide a objectively reasonable basis upon which to allege infringement of the '761 and '185 patents by all of Atticus's azoxystrobin products.

296. This case is an exceptional case pursuant to 35 U.S.C. § 285, and therefore Atticus is entitled to an award of attorneys' fees and costs.

**WHEREFORE**, Defendant and Counterclaim Plaintiff Atticus, having answered the Complaint, and having counterclaimed as set forth herein, respectfully prays for the following relief:

a. Dismissal of Syngenta's Complaint with prejudice and entry of judgment in favor of Atticus with respect to all claims alleged in the Complaint;

b. Judgment declaring that the claims of the '761 and '185 patents have not been infringed literally or under the doctrine of equivalents by Atticus;

c. Judgment declaring that the claims of the '761 and '185 patents are invalid;

d. Judgment that this is an exceptional case pursuant to 35 U.S.C. § 285, and an award to Atticus of its costs and reasonable attorneys' fees, together with interest, including prejudgment interest thereon;

e. Judgment declaring that Syngenta has defamed Atticus through its published false statements concerning Atticus's alleged infringement of Syngenta's patents, and an award to Atticus of damages in an amount sufficient to compensate Atticus for damage to its reputation and business standing in the U.S. agricultural market, together with punitive damages in an amount to punish Syngenta for such misconduct and to deter such conduct in the future;

f. Judgment declaring that Syngenta has committed acts in violation of Section 2 of the Sherman Act, an award to Atticus of compensatory damages in an amount to be proved at trial, which damages should be trebled, an award of appropriate injunctive relief, and an award of Atticus's reasonable attorneys' fees, costs and expenses, as permitted by law;

g. Judgment declaring that Syngenta has committed acts in violation of N.C. Gen. Stat. § 75-1.1, *et seq.* and an award to Atticus of compensatory damages in an amount to be proved at trial, which damages should be trebled, an award of appropriate injunctive relief, and an award of Atticus's reasonable attorneys' fees, costs and expenses, as permitted by law;

h. An award to Atticus of prejudgment and post-judgment interest as permitted by law;

i. Denial of any injunctive relief sought by Syngenta;

j. That Syngenta not be awarded any damages, costs, expenses, attorneys' fees or other relief;

k. A trial by jury on all issues so triable; and

l. Such other and further relief as may be deemed just and appropriate.

Dated: June 29, 2021


/s/ Robert J. Scheffel
Matthew J. Dowd
mdowd@dowdscheffel.com
Robert J. Scheffel
rscheffel@dowdscheffel.com
DOWD SCHEFFEL PLLC
1717 Pennsylvania Ave, NW
Suite 1025
Washington, D.C. 20006
Telephone: (202) 559-9175

/s/ Robert J. Morris
Robert J. Morris
N.C. State Bar No. 15981
jmorris@smithlaw.com
SMITH ANDERSON BLOUNT DORSETT
MITCHELL & JERNIGAN, LLP
2300 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, North Carolina 27601
Telephone: (919) 821-1220
Facsimile: (919) 821-6800

*Attorneys for Defendant*
*Atticus, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 1st day of July, 2021, the foregoing Amended Answer and Counterclaims (Redacted) was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to the attorneys of record for Syngenta Crop Protection, LLC.

/s/ Robert J. Scheffel

Robert J. Scheffel
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, N.W.
Suite 1025
Washington, D.C. 20006
Telephone: (202) 559-9175
Facsimile: (202) 204-5877
rscheffel@dowdscheffel.com